Leonard M. Shulman – Bar No. 126349
Lynda T. Bui – Bar No. 201002
Brandon J. Iskander – Bar No. 300916
**SHULMAN HODGES & BASTIAN LLP**
100 Spectrum Center Drive, Suite 600
Irvine, California 92618
Telephone:     (949) 340-3400
Facsimile:     (949) 340-3000
Email:         lshulman@shbllp.com; lbui@shbllp.com;
               biskander@shbllp.com

Attorneys for David M. Goodrich,
Chapter 7 Trustee

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No.  2:17-bk-25543-ER |
| **NORLAINE, INC.**  dba **Patina-V,** | Chapter  7 |
| Debtor. | **CHAPTER 7 TRUSTEE'S MOTION FOR ORDER:** |
| | **(1) APPROVING THE SALE OF PERSONAL PROPERTY OF THE ESTATE (TRADEMARKS) PURSUANT TO BANKRUPTCY CODE § 363(b)(1) AND (f), SUBJECT TO OVERBIDS, COMBINED WITH NOTICE OF BIDDING PROCEDURES AND REQUEST FOR APPROVAL OF THE BIDDING PROCEDURES UTILIZED; AND** |
| | **(2) GRANTING RELATED RELIEF;** |
| | **MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF DAVID M. GOODRICH IN SUPPORT THEREOF** |
| | **Hearing Date:**<br>Date:   September 5, 2018<br>Time:   11:00 a.m.<br>Place:  Courtroom 1568<br>            United States Bankruptcy Court<br>            255 East Temple Street<br>            Los Angeles, CA 90012 |

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

1

5405-000\1249443.1

# TABLE OF CONTENTS

**Page**

I.    SUMMARY OF ARGUMENT ..................................................................................4

II.    RELEVANT FACTS ..............................................................................................4

    A.    Case Commencement..................................................................................4

    B.    The Trademark Assets ................................................................................5

    C.    Marketing of the Trademark Assets...........................................................5

    D.    Liens and Encumbrances Against the Trademark Assets and Their
        Proposed Treatment Through the Sale........................................................6

    E.    Summary of the Purchase Offer and Summary of Sale Terms...................6

    F.    Notice of Bidding Procedures ....................................................................8

III.    ARGUMENT........................................................................................................10

    A.    There is a Good Business Reason for the Sale and the Sale is in the Best
        Interest of the Estate.................................................................................10

        1.    *Sound Business Purpose*.............................................................10

        2.    *The Sale Serves the Best Interests of the Estate and Creditors*...............11

        3.    *Accurate and Reasonable Notice*................................................11

        4.    *The Sale is Made in Good Faith*................................................12

    B.    The Proposed Sale Should be Allowed Free and Clear of Liens............12

    C.    The Court as the Authority to Approve the Bidding Procedures............13

    D.    The Court has the Authority to Waive the Fourteen-Day Stay of Sale. ...............15

IV.    CONCLUSION.....................................................................................................15

DECLARATION OF DAVID M. GOODRICH ..........................................................17

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

5405-000\1249443.1

# TABLE OF AUTHORITIES

**Page**

## CASES

*In re Continental Air Lines, Inc.*,
    780 F.2d 1223 (5th Cir. 1986) ............................................................................... 10

*In re Lionel Corp.*,
    722 F.2d 1063 (2d Cir. 1983).......................................................................... 10, 11

*In re Wilde Horse Enterprises, Inc.*,
    136 B.R. 830, 841 (Bankr. C.D. Cal. 1991)................................................... 10, 12

## STATUTES

Bankruptcy Code Section 102(1)........................................................................... 11

Bankruptcy Code Section 105(a) .................................................................... 13, 14

Bankruptcy Code Section 363(b) ......................................................................... 10

Bankruptcy Code Section 363(b)(1) ............................................................... 13, 14

Bankruptcy Code Section 363(f) .......................................................................... 12

Bankruptcy Code Section 363(m).......................................................................... 12

## RULES

Federal Rule of Bankruptcy Procedure 2002(c)(1)................................................ 11

Federal Rule of Bankruptcy Procedure 6004(h) .................................................. 15

Local Bankruptcy Rule 6004-1(f) ......................................................................... 11

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

3

5405-000\1249443.1

**TO THE HONORABLE ERNEST M. ROBLES, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE AND ALL INTERESTED PARTIES**:

David M. Goodrich ("Trustee"), the Chapter 7 trustee for the bankruptcy estate ("Estate") of Norlaine, Inc. dba Patina-V ("Debtor"), brings this *Motion for Order: (1) Approving the Sale of Personal Property of the Estate (Trademarks) Pursuant to Bankruptcy Code § 363(b)(1), Subject to Overbids, Combined With Notice of Bidding Procedures and Request for Approval of the Bidding Procedures Utilized; and (2) Granting Related Relief* ("Sale Motion") and respectfully represents as follows:

## I.      SUMMARY OF ARGUMENT

Trustee has received an offer from CNL Mannequins to purchase the Trademark Assets[1] for $80,000.00, subject to overbids.  The offer is all cash and is the best offer the Estate has received for the Trademark Assets.  The Trademark Assets are very industry-specific assets, so the pool of buyers (e.g. manufacturers of mannequins) is rather small.  Through the sale, the Trustee is expected to generate proceeds of at least $20,000 for the benefit of the Estate and its creditors.  Further, in the event the purchase price is increased by a successful overbid, the estimated net proceeds will increase and provide greater distribution to creditors.  Therefore, the Trustee believes that good cause exists to grant the Sale Motion so the Trustee does not lose this favorable business opportunity.

## II.      RELEVANT FACTS

**A.      Case Commencement**

The Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code on December 22, 2017 ("Petition Date").

The deadline for filing claims was April 23, 2018 (government claims were due by June 20, 2018).  The Court's Claims Register indicates that there have been twenty-seven claims filed totaling $2,504,350.84, which includes priority claims totaling $12,269.51, administrative claims totaling $829.37 and general unsecured claims totaling $2,491,251.96.

---

[1]      All capitalized terms are defined below.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

4

5405-000\1249443.1

**B.**     **The Trademark Assets**

In its Schedule A/B filed on December 22, 2017 (docket number 1), item 60, the Debtor indicates that it owns a trademark – Patina-V and that the value is "unknown."

Also in its Schedule A/B, the Debtor lists an interest in the website/domain name "www.patinav.com" and that the value is "$0.00" (the "Website").

Pursuant to the website for the United States Patent and Trademark Office ("USPTO"), it appears that the Debtor owned (1) the word mark registered as "Patina-V", serial number 87481155; (2) the word mark registered as "Patina-V", serial number 77619170; and (3) the word mark registered as "Patina Arts", serial number 77619232 (collectively, the "Trademarks").

The Trustee is informed that on or about September 28, 2007, the Debtor and its parent corporation, IMC Corporation, entered into the *US Security and Pledge Agreement* pursuant to which the Debtor granted to Caisse Régionale de Crédit Agricole Mutuel de Paris et d'Ile-de-France; aka Crédit Agricole d'Ile de France ("Credit Agricole") a security interest in the Trademarks, including an interest in the trademark Vogue International (collectively with the Website and the Trademarks, the "Trademark Assets");

The Trustee and Credit Agricole have entered into the *Amended Stipulation to Sell Trademarks and Related Goodwill of the Estate Free and Clear of Liens* ("Stipulation") which provides that the Trustee shall have the right to sell the Trademark Assets free and clear of Credit Agricole's lien for not less than $80,000 and provides a distribution scheme for the payment of the gross proceeds received from said sale.  A true and correct copy of the Stipulation filed with the Court on July 10, 2018 (docket number 75) is attached as **Exhibit "1"** to the Declaration of David M. Goodrich ("Goodrich Declaration") annexed hereto.  The Stipulation was approved pursuant to the Order entered August 1, 2018 (docket number 82), a copy of which is attached as **Exhibit "2"** to the Goodrich Declaration annexed hereto.

**C.**     **Marketing of the Trademark Assets**

The Trustee recently conducted an auction of the Debtor's personal property assets consisting of mannequins and forms, office furniture, fixtures, software and telephone system, vehicles, machinery and molds, tools and dyes.  As a result of this auction, several parties

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

5

5405-000\1249443.1

expressed an interest in purchasing other assets of the Debtor, including the Trademark Assets. The offer from the Buyer to buy the Trademark Assets is the only offer the Trustee received for the Trademark Assets. Concurrent with the filing of this Sale Motion, the Trustee will file a Notice of Sale of Estate Property on Local Bankruptcy Form 6004-2 ("Sale Notice"), which will be posted on the Court's website.

**D. Liens and Encumbrances Against the Trademark Assets and Their Proposed Treatment Through the Sale**

Other than the lien asserted by Credit Agricole as discussed above, the Trustee is not aware of any other liens and encumbrances impacting the Trademark Assets. However, with the consent of Credit Agricole as provided in the Stipulation, the Trustee seeks to the sell the Trademark Assets free and clear of any and all liens and encumbrances, including the lien asserted by Credit Agricole.

Through the Stipulation, in exchange for Credit Agricole's consent to the sale of the Trademark Assets, the gross proceeds from the sale shall be distributed to Credit Agricole as follows: (1) $60,000 of the first $80,000 in gross proceeds received by the Trustee; (2) 50% of the gross proceeds between $85,000 and $200,000; and (3) 80% of the gross proceeds in excess of $200,000.

**E. Summary of the Purchase Offer and Summary of Sale Terms**

The Trustee received an offer from CNL Mannequins ("Buyer") to purchase the Trademark Assets, which includes any and all social media presence and related goodwill associated therewith, for $80,000.00. In response, the Trustee, through his counsel, prepared the Asset Purchase and Sale Agreement ("Agreement"). Attached as **Exhibit "3"** to the Goodrich Declaration is a true and correct copy of the Agreement.

///

///

///

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

6

5405-000\1249443.1

A summary of the Agreement's terms and highlights are discussed below, but the summary and discussion are not meant to be a complete review of every provision of the Agreement. The Agreement itself is the legally binding document the Trustee seeks approval of, and in the event of any inconsistency between the terms, provisions, or effect of the Agreement and the description of it in these pleadings, the Agreement alone shall govern and not these pleadings or the descriptions herein.

In summary, the principal terms of the sale of the Trademark Assets shall be as follows (the Trustee is referred to at times as the "Seller" in the following summary):

- Purchase Price. The Trustee agrees to sell, and the Buyer agrees to purchase, the Trademark Assets on an "as is" and "where is" basis, without any warranties either express or implied, for Eighty Thousand Dollars ($80,000.00) (the "Purchase Price") or an amount as increased by successful overbid to be paid by the Buyer (provided the Buyer is the successful bidder) upon the entry of a Final Order. The Purchase Price shall be paid in Good Funds (defined below) as follows:

  o Concurrently with the mutual execution and delivery of the Agreement (the date of such mutual execution and delivery is referred to herein as the "Execution Date"), Buyer shall deposit the sum of Five Thousand Dollars ($5,000.00) ("Buyer's Deposit") with the Trustee. The Buyer's Deposit shall be paid in Good Funds (defined below) and made payable to "David M. Goodrich, Chapter 7 Trustee for the bankruptcy estate of Norlaine, Inc." and shall be mailed to the attention of David M. Goodrich, Chapter 7 Trustee, 650 Town Center Drive, Suite 600, Costa Mesa, CA 92626. At the Closing, Buyer's Deposit shall be credited toward payment of the Purchase Price. For purposes of the Agreement, "Good Funds" shall mean immediately available funds in the form of cash or wire transfer of funds.

  o No later than one (1) day prior to the Closing Date, Buyer shall deliver the Trustee, in Good Funds, the Purchase Price less Buyer's Deposit. Purchase Price less the Buyer's Deposit shall be paid in Good Funds and made payable to "David M. Goodrich, Chapter 7 Trustee for the bankruptcy estate of Norlaine, Inc." and shall be mailed to the attention of David M. Goodrich, Chapter 7 Trustee, 650 Town Center Drive, Suite 600, Costa Mesa, CA 92626.

  o Buyer's Deposit shall be non-refundable except upon the occurrence of any of the following events: (i) Buyer is not the approved Buyer at the hearing on the Sale Motion (as defined herein), (ii) Buyer is overbid and such overbid receives Bankruptcy Court approval and proceeds to closing, (iii) the termination of the Agreement for any reason other than Buyer's default or breach of the Agreement, or (iv) Seller's inability to consummate the transaction contemplated by the Agreement, and in any of such events, the Trustee shall return Buyer's Deposit to Buyer. At the Closing, Buyer's Deposit shall be credited toward payment of the Purchase Price.

- Closing. The closing of the purchase and sale of the Trademark Assets as contemplated by the Agreement (referred to throughout the Agreement as the "Closing") shall take place at the offices of Shulman Hodges & Bastian LLP, located at 100 Spectrum Center Drive, Suite 600, Irvine, California. The Closing shall be held within fifteen (15) days after the Bankruptcy Court enters an order approving the sale of the Trademark Assets unless otherwise approved by the Trustee (referred to throughout the Agreement as the "Closing Date").

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

7

5405-000\1249443.1

- <u>Deliveries at the Closing</u>.

  o    Deliveries by Buyer.  No later than one (1) day prior to the Closing Date, Buyer shall deliver, or cause to be delivered to the Trustee, in Good Funds, the Purchase Price less Buyer's Deposit.

  o    Deliveries by Seller.  At Closing, Seller shall deliver to Buyer the following:

  ▪    an original Bill of Sale in the form attached to the Agreement as Exhibit A, executed by the Seller dated as of the Closing Date; and

  ▪    such additional documentation as Buyer may reasonably request to consummate the transaction contemplated hereby.

- <u>Sale Subject to Overbid</u>.  In order to obtain the highest and best offer for the benefit of the creditors of the Estate, the sale of the Trademark Assets shall be subject overbids.

- <u>Entry of Sale Approval Order</u>.  No later than two (2) business days after execution of the Agreement, Seller shall file a motion reasonably acceptable to Buyer (the "Sale Motion") with the Bankruptcy Court seeking entry of an order in form and substance satisfactory to Buyer which shall contain, without limitation, the following provisions (the "Sale Approval Order"): (a) approving the terms and conditions of the Agreement and the sale of the Trademark Assets to Buyer; (b) requesting approval of the Bidding Procedures (defined below); (c) finding that the Purchase Price constitutes fair value for the Trademark Assets; (d) finding that notice of the transactions contemplated hereby and of the terms of the Agreement was good and sufficient and was provided timely to all creditors and parties-in-interest, including, without limitation, any and all creditors holding liens or encumbrances on the Trademark Assets; (e) authorizing and directing the Trustee to consummate the transactions contemplated by the Agreement and to comply in all respects with the terms of the Agreement; and (f) finding that the transactions contemplated by the Agreement were negotiated at arm's length, that Buyer acted in good faith in all respects, and that the Buyer is entitled to the protections of Section 363(m) of the Bankruptcy Code.

- <u>Subject to Bankruptcy Court Approval</u>.  Seller shall use its best efforts to cause the Bankruptcy Court to enter the Sale Approval Order.  The Agreement is expressly contingent upon the Seller obtaining Bankruptcy Court approval of the sale of the Trademark Assets with a finding that Buyer is in good faith pursuant to Bankruptcy Code section 363(m).  The Seller makes no warranties, either express or implied, as to his ability to obtain approval of the Bankruptcy Court and entry of a Sale Approval Order, and in the event that the Seller is unable to obtain said approval and Sale Approval Order, Buyer and its officers, directors, shareholders, agents, successors and assigns shall hold Seller and its attorneys and agents harmless from any and all damages which Buyer may allege he has suffered as a result therefrom.  Buyer's Deposit shall be immediately refunded in the event such approval is not obtained.

## F.    <u>Notice of Bidding Procedures</u>

The Trustee has determined that it would benefit the Estate to permit all interested parties to receive information and bid for the Trademark Assets instead of selling the Trademark Assets to the Buyer on an exclusive basis.  Accordingly, in order to obtain the highest and best offer for

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

8

5405-000\1249443.1

the benefit of the creditors of this Estate, the Trustee also seeks Court approval of the following bidding procedures ("Bidding Procedures"):

- Potential overbidders must bid an initial amount of at least $5,000.00 over the Purchase Price or $85,000.00. Minimum bid increments thereafter shall be $500.00. The Trustee shall have sole discretion in determining which overbid is the best for the Estate and will seek approval from the Court of the same.

- Overbids must be in writing and be received by the Trustee and his counsel, Brandon J. Iskander of Shulman Hodges & Bastian LLP **no later than three (3) business days prior to the hearing on the Sale Motion.**

- Overbids must be accompanied by a deposit ("Overbidder Deposit") in the form of certified funds in the amount of at least Five Thousand Dollars ($5,000.00) payable to Trustee.

- The overbidder must also provide evidence of having sufficient specifically committed funds to complete the transaction for the bid amount and such other documentation relevant to the bidder's ability to qualify as the Buyer and ability to close the sale and immediately and unconditionally pay the winning bid purchase price at closing.

- The overbidder must seek to acquire the Trademark Assets on terms and conditions not less favorable to the Estate than the terms and conditions to which the Buyer has agreed to purchase the Trademark Assets, including but not limited to, waiver of any and all due diligence and other contingencies such that all bidders shall become non-contingent as provided in the Agreement and closing on the sale of the Trademark Assets in the same time parameters as the Buyer.

- If one or more overbids are received, the final bidding round for the Estate's interest in the Trademark Assets shall be held at the hearing on the Sale Motion in order to allow all potential bidders the opportunity to overbid and purchase the Estate's interest in the Trademark Assets. At the final bidding round to be conducted before the Bankruptcy Court, the Trustee will seek entry of an order, inter alia, authorizing and approving the sale of the Estate's interest in the Trademark Assets to the bidder who the Trustee, in the exercise of his business judgment, may determine to have made the highest and best offer to purchase the Estate's interest in the Trademark Assets, consistent with the Bidding Procedures ("Successful Bidder"). The hearing on the Sale Motion may be adjourned or rescheduled without notice other than by an announcement of the adjourned date at the hearing on the Sale Motion.

- In the event the Successful Bidder fails to close on the sale of the Estate's interest in the Trademark Assets within the time parameters approved by the Court, the Trustee shall retain the Successful Bidder's Deposit and will be released from his obligation to sell the Trademark Assets to the Successful Bidder and the Trustee may then sell the Trademark Assets to the first back-up bidder approved by the Court at the hearing on the Sale Motion ("First Back-Up Bidder").

- In the event First Back-Up Bidder fails to close on the sale of the Trademark Assets within the time parameters approved by the Court, the Trustee shall retain the First Back-Up Bidder's Deposit and will be released from his obligation to sell the Estate's interest in the Trademark Assets to the First Back-Up Bidder and the Trustee may then sell the Estate's interest in the Trademark Assets to the second back-up bidder approved by the Court at the hearing on the Sale Motion ("Second Back-Up Bidder").

///

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

9

5405-000\1249443.1

### III.    ARGUMENT

**A.    There is a Good Business Reason for the Sale and the Sale is in the Best Interest of the Estate.**

The Trustee, after notice and hearing, may sell property of the estate.  11 U.S.C. § 363(b). The standards to establish are: (1) that there is a sound business purpose for the sale, (2) that the sale is in the best interests of the estate, i.e., the sale is for a fair and reasonable price, (3) that there is accurate and reasonable notice to creditors and (4) that the sale is made in good faith.  *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991); *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir. 1983).  The Trustee's proposed sale of the Purchased Assets meets the foregoing criteria.

1.    ***Sound Business Purpose***

The Ninth Circuit has adopted a flexible, case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under Section 363(b).  *In re Walter*, 83 B.R. 14 (B.A.P. 9th Cir. 1988).  In *Walter*, the Ninth Circuit, adopting the reasoning of the Fifth Circuit in *In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986), and the Second Circuit in *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983), set forth the following standard to be applied under Bankruptcy Code Section 363(b):

> Whether the proffered business justification is sufficient depends on the case.  As the Second Circuit held in Lionel, the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike.  He might, for example, look to such relevant factors as the proportionate value of the assets to the estate as a whole, the amount of lapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasingly or decreasing in value.  This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*Walter*, 83 B.R. at 19-20 (quoting *Continental*, 780 F.2d at 1226).

Here, the facts surrounding the sale of the Trademark Assets support the Trustee's business decision that the proposed sale is in the best interests of the Estate and its creditors.  The offer represents the best offer the Trustee has received for the Trademark Assets.  The

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

10

5405-000\1249443.1

Trademark Assets are very industry-specific assets, so the pool of buyers (e.g. manufacturers of mannequins) is rather small.  Through the sale, and pursuant to the terms of the Stipulation, the Trustee shall have the right to retain, for the benefit of the Estate:   (a) $20,000 of the first $80,000 in gross proceeds received; (b) 100% of the next $5,000 in gross proceeds from $80,000 to $85,000; (c) 50% of the gross proceeds between $85,000 and $200,000; and (d) 20% of the gross proceeds in excess of $200,000.

As such, the sale of the Trademark Asses will generate proceeds of at least $20,000 which will benefit the Estate.  If the Sale Motion is not approved, then there will be a substantial loss to the Estate.

Therefore, the Trustee respectfully submits that, if this Court applies the good business reason standard suggested by the Second Circuit in *Lionel*, the sale should be approved.

2.    ***The Sale Serves the Best Interests of the Estate and Creditors***

The Trustee believes that it would be in the best interest of the Estate and its creditors to sell the Trademark Assets as it is anticipated that the sale will generate at least $20,000 or more if there are overbids.

3.    ***Accurate and Reasonable Notice***

It is expected that notice of this Sale Motion will satisfy the requirements for accurate and reasonable notice and will be appropriate under the circumstances of this case.

The notice requirements for sales are set forth in Federal Rules of Bankruptcy Procedure ("FRBP") 6004 and 2002.  The notice must include the time and place of any public sale, the terms and conditions of any private sale, the time fixed for filing objections and a general description of the property.  Fed. R. Bankr. P. 2002(c)(1).

In compliance with FRBP 2002 and Bankruptcy Code Section 102(1), the Trustee shall provide notice of the terms and conditions of the proposed private sale of the Trademark Assets to creditors and parties in interest.  The notice of this Sale Motion will include the time fixed for filing objections and a general description of the Trademark Assets.

Additionally, pursuant to Local Bankruptcy Rule, 6004-1(f), an additional copy of the notice and court-approved form F 6004-2, Notice of Sale of Estate Property, will be submitted to

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

11

5405-000\1249443.1

1    the clerk at the time of the filing of this Sale Motion for purposes of publication by the Clerk on

2    the Court's website.

3         Therefore, the Trustee submits that the notice requirements will have been satisfied,

4    thereby allowing creditors and parties in interest an opportunity to object to the sale. Hence, no

5    further notice should be necessary.

6         4.    ***The Sale is Made in Good Faith***

7         The proposed sale has been brought in good faith and has been negotiated on an "arms

8    length" basis. The court, in *Wilde Horse Enterprises*, set forth the factors in considering whether

9    a transaction is in good faith. The court stated:

10       'Good faith' encompasses fair value, and further speaks to the integrity of the
     transaction. Typical 'bad faith' or misconduct, would include collusion between
11   the seller and buyer, or any attempt to take unfair advantage of other potential
     purchasers. . . . And, with respect to making such determinations, the court and
12   creditors must be provided with sufficient information to allow them to take a
     position on the proposed sale.
13

14   *Id.* at 842 (citations omitted).

15        In the present case, the negotiation of the proposed sale was an arms-length transaction.

16   The negotiations with the Buyer resulted in a sale price of $80,000.00 for the Estate that will

17   have substantial benefit to the Estate. Accordingly, the sale is in good faith and should be

18   approved. The Trustee requests such a finding pursuant to Bankruptcy Code Section 363(m).

19        The proposed sale will generate cash for the Estate in the amount of at least $20,000,

20   which may increase if there are overbids. The estimated net proceeds will benefit the Estate by

21   providing distribution to creditors. If the Sale Motion is not approved, the Trustee will have to

22   find another buyer for the Trademark Assets, which will be difficult, or will have to make the

23   decision to abandon the Trademark Assets. As such, the sale is based on good business reason

24   and is in the best interest of the Estate.

25   **B.**    **The Proposed Sale Should be Allowed Free and Clear of Liens**

26        Section 363(f) of the Bankruptcy Code allows a trustee to sell property of the bankruptcy

27   estate "free and clear of any interest in such property of an entity," if any one of the following

28   five conditions is met:

**SHULMAN HODGES &**
**BASTIAN LLP**
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

12

5405-000\1249443.1

(1)    applicable non-bankruptcy law permits a sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such interest.

11 U.S.C. § 363(f).

Section 363(f) is written in the disjunctive and thus only one of the enumerated conditions needs to be satisfied for Court approval to be appropriate.  Pursuant to the Stipulation, the Trustee has obtained the consent of Credit Agricole to sell the Trademark Assets free and clear of the liens of Credit Agricole pursuant to Section 363(f)(2), provided that the sale price not be less than $80,000.  The Trustee is not aware of any other liens and encumbrances impacting the Trademark Assets.  However, out of an abundance of caution, the Trustee seeks to the sell the Trademark Assets free and clear of any and all other liens and encumbrances, with all such liens and encumbrances not satisfied through the sale to attach to the proceeds of the sale with the same priority, validity, force and effect as they existed with respect to the Trademark Assets before the closing of the sale pending further Court order or agreement with the parties.  Accordingly, the Trustee seeks to sell the Trademark Assets under Bankruptcy Code Section 363(f).

C.    **The Court as the Authority to Approve the Bidding Procedures**

Implementation of the Bidding Procedures is an action outside of the ordinary course of the business.  Bankruptcy Code Section 363(b)(1) provides that a trustee "after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Furthermore, under Bankruptcy Code Section 105(a), "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Thus, pursuant to Bankruptcy Code sections

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

13

5405-000\1249443.1

1    363(b)(1) and 105(a), this Court may approve the Bidding Procedures, which assist the Trustee

2    to obtain the best possible price on the best possible terms for the Trademark Assets.

3    The proposed Bidding Procedures serve the Estate in several ways.  First, the Bidding

4    Procedures themselves are fair, reasonable and productive; they will permit the Trustee to

5    conduct an orderly sale and obtain the best possible price on the best possible terms for the

6    Trademark Assets.

7    The Bidding Procedures will ensure that all bids will be comparable.  The Trustee will

8    determine which bid is the highest and best for the Estate.  The comparability requirement of the

9    Bidding Procedures will make it possible to accomplish this task.

10    The Bidding Procedures will help the Trustee to obtain the highest and best possible price

11    for the Trademark Assets. The Bidding Procedures institute minimum overbid increments which

12    the Trustee believes are reasonable.  Thus, the Trustee will be able to obtain substantial benefit

13    for this Estate from the sale of the Trademark Assets from competing bids.

14    The Bidding Procedures require that potential bidders demonstrate their capacity to

15    complete the transaction.  It would be a serious loss to the Estate if it surrendered its opportunity

16    to sell the Trademark Assets to one buyer in favor of a competing bidder only to discover the

17    successful bidder incapable of consummating the transaction.  Thus, requiring bidders to qualify

18    as qualified bidders will protect the Estate from such a loss.

19    Finally, the most important benefit of the Bidding Procedures to the Estate is that their

20    implementation will enable the consummation of the proposed sale.  The proposed sale will be

21    the best way to obtain the maximum and most expedient recovery for creditors of this Estate.

22    Implementation of the Bidding Procedures is an essential component of consummating the sale

23    of the Trademark Assets and maximizing the value of the Trademark Assets for the Estate and

24    creditors.

25    The Bidding Procedures proposed by the Trustee are fair and provide for a "level playing

26    field" for all prospective bidders with respect to the Trademark Assets. The proposed Bidding

27    Procedures establish a reasonable but expeditious timeline for allowing the Trustee to give notice

28    of the proposed sale and qualified bidders to conduct reasonable due diligence and submit

**SHULMAN HODGES &
BASTIAN LLP**
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

14

5405-000\1249443.1

competing offers for the Trademark Assets, thereby potentially generating additional value for the Trademark Assets.  Furthermore, the notice that the Trustee proposes to provide to creditors and parties in interest in connection with the Bidding Procedures and Sale Motion is designed to attract the most interest in the acquisition of the Trademark Assets and is sufficient under the circumstances of this case.  Thus, approval of the Bidding Procedures will serve the best interests of the Estate and its creditors.

**D.**    **The Court has the Authority to Waive the Fourteen-Day Stay of Sale.**

Federal Rule of Bankruptcy Procedure 6004(h) provides that "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the Court orders otherwise." Fed. Rule Bankr. P. 6004(h).  The Trustee desires to close the sale of the Trademark Assets as soon as practicable after entry of an order approving the sale.  Accordingly, the Trustee requests that the Court, in the discretion provided it under Federal Rule of Bankruptcy Procedure 6004(h), waive the fourteen-day stay requirement.

## IV.    CONCLUSION

**WHEREFORE,** based upon the foregoing, the Trustee respectfully submits that good cause exists for granting the Sale Motion and requests the Court enter an order as follows:

1.    Approving the Bidding Procedures utilized by the Trustee;

2.    Authorizing the Trustee to sell the Trademark Assets on an as-is, where-is basis, without any warranties or representations, to the Buyer, pursuant to the terms and conditions as set forth in the Agreement attached as **Exhibit "3"** to the Goodrich Declaration;

3.    Authorizing the sale of the Trademark Assets free and clear of the liens asserted by Credit Agricole, as well as any other liens that may be asserted, with any other liens (not including the lien asserted by Credit Agricole) not satisfied through the sale to attach to the sale proceeds in the same validity and priority as prior to the closing of the sale;

4.    Authorizing the Trustee to sign any and all documents convenient and necessary in pursuit of the sale of the Trademark Assets pursuant to the terms of the Agreement, including but not limited to any and all conveyances contemplated by the sale;

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

15

5405-000\1249443.1

5.    A determination by the Court that the Buyer is in good faith with respect to the sale pursuant to Bankruptcy Code Section 363(m);

6.    Waiving the fourteen (14) day stay of the order approving the sale of the Trademark Assets under Federal Rules of Bankruptcy Procedure 6004(h); and

7.    For such other and further relief as the Court deems just and proper under the circumstances of this case.

Respectfully submitted,

**SHULMAN HODGES & BASTIAN LLP**

Dated:  August 14, 2018    */s/ Brandon J. Iskander*

Leonard M. Shulman
Lynda T. Bui
Brandon J. Iskander
Attorneys for David M. Goodrich, Chapter 7 trustee for the bankruptcy estate of Norlaine, Inc. dba Patina-V

**SHULMAN HODGES &
BASTIAN LLP**
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

16

5405-000\1249443.1

## **DECLARATION OF DAVID M. GOODRICH**

I, David M. Goodrich, declare and state as follows:

1.      I am the duly appointed, qualified and acting Chapter 7 trustee for the bankruptcy estate of *In re Norlaine, Inc. dba Patina-V, Case No. 2:17-bk-25543-ER* ("Debtor").  I have personal knowledge of the facts set forth herein, and if called and sworn as a witness, I could and would competently testify thereto, except where matters are stated on information and belief, in which case I am informed and believe that the facts so stated are true and correct.

2.      I make this Declaration in support of my *Motion for Order: (1) Approving the Sale of Personal Property of the Estate (Trademarks) Pursuant to Bankruptcy Code § 363(b)(1), Subject to Overbids, Combined With Notice of Bidding Procedures and Request for Approval of the Bidding Procedures Utilized; and (2) Granting Related Relief* ("Sale Motion"). All capitalized terms not otherwise defined herein shall have the meaning set forth in the Sale Motion.

3.      I have read and I am aware of the contents of the Sale Motion.  The facts stated in the Sale Motion are true to the best of my knowledge.

4.      I have reviewed the docket and on December 22, 2017, the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code.

5.      In its Schedule A/B, filed on December 22, 2017 (docket number 1), item 60, the Debtor indicates that it owns a trademark – Patina-V and that the value is "unknown."  Also in its Schedule A/B, the Debtor lists an interest in the website/domain name "www.patinav.com" and that the value is "$0.00" (the "Website").

6.      Pursuant to the website for the United States Patent and Trademark Office ("USPTO"), it appears that the Debtor owned (1) the word mark registered as "Patina-V", serial number 87481155; (2) the word mark registered as "Patina-V", serial number 77619170; and (3) the word mark registered as "Patina Arts", serial number 77619232 (collectively, the "Trademarks").

7.      I am informed that on or about September 28, 2007, the Debtor and its parent corporation, IMC Corporation, entered into the *US Security and Pledge Agreement* pursuant to which the Debtor granted to Caisse Régionale de Crédit Agricole Mutuel de Paris et d'Ile-de-

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

17

5405-000\1249443.1

France; aka Crédit Agricole d'Ile de France ("Credit Agricole") a security interest in the Trademarks, including an interest in the trademark Vogue International (collectively with the Website and the Trademarks, the "Trademark Assets").

8.    Credit Agricole and I have entered into the *Amended Stipulation to Sell Trademarks and Related Goodwill of the Estate Free and Clear of Liens* ("Stipulation") which provides that the Trustee shall have the right to sell the Trademark Assets free and clear of Credit Agricole's lien for not less than $80,000 and provides a distribution scheme for the payment of the gross proceeds received from said sale. A true and correct copy of the Stipulation filed with the Court on July 10, 2018 (docket number 75) is attached hereto as **Exhibit "1"** and incorporated herein by reference. A true and correct copy of the Order approving the Stipulation entered on August 1, 2018 (docket number 82) is attached hereto as **Exhibit "2"** and incorporated herein by reference.

9.    I am informed that the Trademarks are very industry-specific assets, so the pool of buyers (e.g. manufacturers of mannequins) is rather small. Moreover, the value of the Estate's interest in the Website may be difficult to ascertain. However, I recently conducted an auction of the Debtor's personal property assets consisting of mannequins and forms, office furniture, fixtures, software and telephone system, vehicles, machinery and molds, tools and dyes. As a result of this auction, several parties expressed an interest in purchasing other assets of the Debtor, including the Trademark Assets. Therefore, I do not believe that the employment of a broker to market the Estate's interest in the Trademark Assets for sale is not warranted. As such, there is no broker that will be involved in the sale transaction, and no escrow company will be utilized. It is anticipated that there will be no costs associated with the sale other than regular administrative costs of the Debtor's Estate.

10.    I received an offer from CNL Mannequins ("Buyer") to purchase the Trademark Assets for $80,000, subject to overbids. In response, through my counsel, I prepared the Asset Purchase and Sale Agreement ("Agreement"). Attached hereto as **Exhibit "3"** is a true and correct copy of the Agreement.

///

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

18

5405-000\1249443.1

11. The offer from the Buyer to buy the Trademark Assets is the only offer I have received for the Trademark Assets. I believe that it would benefit the Estate to permit all interested parties to receive information and bid for the Trademark Assets instead of selling the Trademark Assets to the Buyer on an exclusive basis. Accordingly, in order to obtain the highest and best offer for the benefit of the creditors of this Estate, I also seek Court approval of the Bidding Procedures described in the Sale Motion.

12. Other than the lien asserted by Credit Agricole, I am not aware of any other liens and encumbrances impacting the Trademark Assets. However, with the consent of Credit Agricole as provided in the Stipulation, I am seeking to the sell the Trademark Assets free and clear of any and all liens and encumbrances, including the lien asserted by Credit Agricole.

13. For the reasons set forth in the Sale Motion and this Declaration, I respectfully request that the Court grant the Sale Motion so that I do not lose this favorable business opportunity to generate funds for the Estate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August __, 2018, at Costa Mesa, California.

_____
David M. Goodrich

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Centre Drive
Suite 600
Irvine, CA 92618

19

5405-000\1249443.1

# EXHIBIT "1"

# STIPULATION

1  Leonard M. Shulman - Bar No. 126349
   Lynda T. Bui - Bar No. 201002
2  Brandon J. Iskander – Bar No. 300916
   **SHULMAN HODGES & BASTIAN LLP**
3  100 Spectrum Center Drive, Suite 600
   Irvine, California 92618
4  Telephone:    (949) 340-3400
   Facsimile:    (949) 340-3000
5  Email:    lshulman@shbllp.com; lbui@shbllp.com;
              biskander@shbllp.com
6
   Attorneys for David M. Goodrich,
7  Chapter 7 Trustee

8            **UNITED STATES BANKRUPTCY COURT**

9      **CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION**

10

11 In re                              Case No. 2:17-bk-25543-ER

12 **NORLAINE, INC.** dba **Patina-V,**    Chapter 7

13 Debtor.                            **AMENDED STIPULATION BETWEEN CHAPTER 7**
                                      **TRUSTEE AND CREDIT AGRICOLE TO SELL**
14                                    **TRADEMARKS AND RELATED GOODWILL OF**
                                      **THE ESTATE FREE AND CLEAR OF LIENS**
15
                                      [No Hearing Requested Pursuant to Local Bankruptcy Rule
16                                    9013-1(o)]

17

18    Attached is the *Amended[1] Stipulation to Sell Trademarks and Related Goodwill of the Estate*

19 *Free and Clear of Liens* entered into between David M. Goodrich, the chapter 7 trustee for the

20 bankruptcy estate of Norlaine, Inc. dba Patina-V and Caisse Régionale de Crédit Agricole Mutuel

21 de Paris et d'Ile-de-France; aka Crédit Agricole d'Ile de France.

22                            **SHULMAN HODGES & BASTIAN LLP**

23   Dated:  July 10, 2018       By:    */s/ Brandon J. Iskander*
                                        Leonard M. Shulman
24                                      Lynda T. Bui
                                        Brandon J. Iskander
25                                      Attorneys for David M. Goodrich,
                                        Chapter 7 Trustee for the bankruptcy estate
26                                      of Norlaine, Inc. dba Patina-V

27 _____

28 [1]    The Stipulation is amended to include the exhibits that were inadvertently omitted from the Stipulation filed
   with the Court on June 13, 2018 (docket number 72). Other than the exhibits included herewith, the language set forth
   in the Stipulation remains unchanged.

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

4889-000\1231704.1

**EXHIBIT "1"**
**Page 21**

# AMENDED STIPULATION TO SELL TRADEMARKS AND RELATED GOODWILL OF THE ESTATE FREE AND CLEAR OF LIENS

1 | JEFFREY C. KRAUSE, SBN 94053
    jkrause@gibsondunn.com
2 | GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
3 | Los Angeles, CA  90071-3197
   Telephone: 213.229.7000
4 | Facsimile:  213.229.7520

5 | Attorneys for Creditor
   CAISSE RÉGIONALE DE CRÉDIT AGRICOLE
6 | MUTUEL DE PARIS ET D'ILE-DE-FRANCE; aka
   CRÉDIT AGRICOLE D'ILE DE FRANCE

7

8 | UNITED STATES BANKRUPTCY COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10 | LOS ANGELES DIVISION

11 | In re: | CASE NO. 2:17-BK-25543-ER

12 | NORLAINE, INC., | Chapter 7

13 | Debtor. | **AMENDED**
**STIPULATION TO SELL TRADEMARKS**
**AND RELATED GOODWILL OF THE**
14 | | **ESTATE FREE AND CLEAR OF LIENS**

15 | | **[No Hearing Required]**

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

5405-000\1231486.1

1

This Stipulation is entered into by and between Caisse Régionale de Crédit Agricole Mutuel de Paris et d'Ile-de-France; aka Crédit Agricole d'Ile de France ("**Credit Agricole**") and David M. Goodrich, in his capacity as chapter 7 trustee (the "**Trustee**") of Norlaine, Inc. (the "**Debtor**"), based upon the following facts:

(a)    The Debtor is a Delaware corporation having its principle place of business in California.

(b)    The Trustee has previously conducted a sale of all or substantially all of the physical assets of the Debtor.

(c)    As of the petition date, the Debtor owned certain trademarks listed and all extensions and renewals thereof and all goodwill associated therewith or symbolized thereby, as listed in the UCC-1 financing statement attached hereto as Exhibit "A" and incorporated herein by this reference (the "**Trademark Collateral**"), which Credit Agricole has filed with the Delaware Secretary of State.

(d)    On or about September 28, 2007, the Debtor and its parent corporation, IMC Corporation, entered into the *US Security and Pledge Agreement* (the "**Security Agreement**"), pursuant to which the Debtor granted to Credit Agricole a security interest in the Trademark Collateral, a true and correct copy of which is attached hereto as Exhibit "B."

**WHEREFORE**, Trustee and Credit Agricole have agreed to sell the Trademark Collateral and to allocate the proceeds thereof, in a consensual manner as follows:

1.    The Trustee shall have the right to sell the Trademark Collateral free and clear of the liens of Credit Agricole pursuant to Bankruptcy Code § 363(f)(2) pursuant to the terms of this Stipulation for not less than $80,000.

2.    Credit Agricole consents to the sale of the Trademark Collateral free and clear of its liens in exchange for the Trustee's commitment to a pay to Credit Agricole promptly after receipt of the gross proceeds from the sale, the following amounts: (a) $60,000 of the first $80,000 in gross proceeds received by the Trustee; (b) 50% of the gross  proceeds between $85,000 and $200,000; and (c) 80% of the gross proceeds in excess of $200,000.

3.    The Trustee shall have the right to retain for the benefit of the Debtor's estate from the gross proceeds of sale of the Trademark Collateral the following: (a) $20,000 of the first $80,000 in

gross proceeds received; (b) 100% of the next $5,000 in gross proceeds from $80,000 to $85,000; (c) 50% of the gross proceeds between $85,000 and $200,000; and (d) 20% of the gross proceeds in excess of $200,000. The Trustee's costs and any related fees and expenses in connection with the sale will be paid from the Trustee's share of the gross proceeds.

    4.    All proceeds received by Credit Agricole will be applied to reduce the Proof of Claim that it filed on April 19, 2018 in the amount of $926,593.90.

Dated: _____, 2018

                JEFFREY C. KRAUSE
                GIBSON, DUNN & CRUTCHER LLP

                By: _____
                    Jeffrey C. Krause

                *Attorneys for Creditor Agricole*

Dated: June 11, 2018

                BRANDON J. ISKANDER
                SHULMAN HODGES & BASTIAN, LLP

                By: _____
                    Brandon J. Iskander

                *Attorneys for Trustee*

102640940.1

                                  **EXHIBIT "1"**
                                    **Page 25**

# EXHIBIT "A"

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 01:49 PM 01/14/2015
INITIAL FILING # 2015 0174564

SRV: 150050233

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

CSC
2711 Centerville Road
Suite 400
Wilmington, DE 19808

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Norlaine, Inc. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1449 W Industrial Park Street | COVINA | CA | 91722 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Caisse Régionale de Crédit Agricole Mutuel de Paris et d'Ile-de-France | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 26, quai de la Rapée | Paris | | 75012 | FR |

4. COLLATERAL: This financing statement covers the following collateral:

See Schedule I hereto.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
DE SOS     4079464-0004     460602-2

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)   International Association of Commercial Administrators (IACA)

EXHIBIT "A"

SCHEDULE I
TO
UCC-1 FINANCING STATEMENT

All of the Debtor's right, title and interest in, to and under the Trademarks, and products and proceeds thereof. "Trademarks" means (a) the trademarks listed in the table below, all registrations and recordings thereof, and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, and all extensions or renewals thereof, and (b) all goodwill associated therewith or symbolized thereby.

Trademarks

| Owner | Trademark |
|-------|-----------|
| Norlaine, Inc. | PATINA-V |
| | PATINA ARTS |
| | VOGUE INTERNATIONAL |

-2-

# EXHIBIT "A"

# EXHIBIT "B"

**Execution Version**

US SECURITY AND PLEDGE AGREEMENT

dated as of September 28, 2007

among

IMC CORPORATION,

NORLAINE, INC.

and

CREDIT AGRICOLE D'ILE DE FRANCE

as Security Agent

10720963_7

# EXHIBIT "B"

Table of Contents

Page

ARTICLE I Definitions ..................................................................................1

    SECTION 1.01. Defined Terms..............................................................1

    SECTION 1.02. Other Defined Terms.....................................................1

ARTICLE II Acquisition Claims .....................................................................4

    SECTION 2.01. Grant of Security Interest ..............................................4

    SECTION 2.02. Enforcement of Claims and Rights ...............................4

    SECTION 2.03. No Obligation ..............................................................5

    SECTION 2.04. Authorization ...............................................................5

ARTICLE III Pledge of Securities...................................................................6

    SECTION 3.01. Pledge ..........................................................................6

    SECTION 3.02. Delivery of the Pledged Collateral ...............................6

    SECTION 3.03. Representations, Warranties and Covenants ..................7

    SECTION 3.04. Registration in Nominee Name; Denominations...........8

    SECTION 3.05. Voting Rights; Dividends and Interest, etc ...................8

    SECTION 3.06. Authorization ...............................................................9

ARTICLE IV Security Interests in Certain Trademarks..................................10

    SECTION 4.01. Security Interest..........................................................10

    SECTION 4.02. Covenants Regarding Trademark Collateral ...............10

ARTICLE V Representations, Warranties, Covenants and Authorizations ....11

    SECTION 5.01. Authorization to File ...................................................11

    SECTION 5.02. Representations and Warranties ..................................11

    SECTION 5.03. Covenants ...................................................................12

ARTICLE VI Remedies..................................................................................14

    SECTION 6.01. Remedies upon Default ...............................................14

    SECTION 6.02. Grant of License to Use Intellectual Property ............15

    SECTION 6.03. Securities Act, etc .......................................................16

ARTICLE VII Miscellaneous .........................................................................16

# EXHIBIT "B"

SECTION 7.01. Notices .......................................................................................16

SECTION 7.02. Security Interest Absolute ........................................................16

SECTION 7.03. Survival of Agreement ..............................................................17

SECTION 7.04. Binding Effect; Several Agreement ..........................................17

SECTION 7.05. Successors and Assigns .............................................................17

SECTION 7.06. Security Agent Appointed Attorney-in-Fact ............................18

SECTION 7.07. GOVERNING LAW ................................................................18

SECTION 7.08. Waivers; Amendment ................................................................18

SECTION 7.09. WAIVER OF JURY TRIAL .....................................................19

SECTION 7.10. Severability ...............................................................................19

SECTION 7.11. Counterparts ..............................................................................19

SECTION 7.12. Headings ....................................................................................20

SECTION 7.13. Jurisdiction; Consent to Service of Process .............................20

SECTION 7.14. Termination or Release .............................................................20

SECTION 7.15. Information ................................................................................20

Schedules

| Schedule I | Pledged Stock |
| Schedule 3.03(d) | Rights Agreements |
| Schedule 4.01 | Trademark Collateral |
| Schedule 7.01 | Addresses for Notice to Subsidiary Grantors |

# EXHIBIT "B"

This US SECURITY AND PLEDGE AGREEMENT is made as of September 28, 2007 (this "Agreement") by and among IMC CORPORATION, a Delaware corporation ("US Parent"), NORLAINE, INC., a Delaware corporation (the "Company"), and CREDIT AGRICOLE D'ILE DE FRANCE ("Credit Agricole"), as security agent for the Lenders under the Credit Agreement referred to below (in such capacity, the "Security Agent").

Reference is made to the *Convention De Credits* (the "Credit Agreement"), dated September 28, 2007 between SAS Financière Cofrad (the "Borrower"), Credit Agricole, as *Arrangeur* (in such capacity, the "Arranger"), *Agent* (in such capacity, the "Agent") and *Agent des Sûretés* (in such capacity, the "Security Agent"), and the Lenders (*Prêteurs*) from time to time party thereto. The Lenders have agreed to extend credit to the Borrower on the terms and subject to the conditions set forth in the Credit Agreement. The obligations of the Lenders to extend such credit are conditioned upon, among other things, the execution and delivery of this Agreement. US Parent and the Company will derive substantial benefits from the extension of credit to the Borrower pursuant to the Credit Agreement and are willing to execute and deliver this Agreement in order to induce the Lenders to extend such credit. Accordingly, in consideration of the above recitals and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I

Definitions

SECTION 1.01. Defined Terms. All terms defined in the New York UCC (as defined herein) that are used and not otherwise defined in this Agreement shall have the meanings assigned thereto in the New York UCC; the term "instrument" shall have the meaning specified in Article 9 of the New York UCC.

SECTION 1.02. Other Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"Agent" has the meaning assigned to such term in the preamble of this Agreement.

"Arranger" has the meaning assigned to such term in the preamble of this Agreement.

"Borrower" has the meaning assigned to such term in the preamble of this Agreement.

"Collateral" means SPA Collateral, Trademark Collateral and Pledged Collateral.

"Credit Agreement" has the meaning assigned to such term in the preamble of this Agreement.

10720963_7

**EXHIBIT "B"**

"Default" has the meaning assigned to the term "Cas d'Exigibilité
Anticipée Potentiel" in the Credit Agreement.

"Equity Interests" means shares of capital stock, partnership interests,
membership interests in limited liability companies, beneficial interests in trusts or other
equity ownership interests in any Person and any warrants, options or other rights to
acquire any of the foregoing.

"Event of Default" has the meaning assigned to the term "Cas
d'Exigibilité Anticipée" in the Credit Agreement.

"Federal Securities Laws" has the meaning assigned to such term in
Section 5.04.

"Finance Documents" has the meaning assigned to the term "Documents
de Financement" in the Credit Agreement.

"Governmental Authority" means any nation or government, any state,
province, or other political subdivision thereof, any central bank (or similar monetary or
regulatory authority) thereof, and any entity exercising executive, legislative, judicial,
regulatory or administrative functions of or pertaining to government.

"Grantors" means US Parent and the Company.

"Infringe" means to infringe, misappropriate, dilute or otherwise violate.

"Lenders" has the meaning assigned to the term "Prêteurs" in the Credit
Agreement.

"Lien" means any mortgage, pledge, security interest, encumbrance,
restriction, lien or charge of any kind (including any agreement to give any of the
foregoing, any conditional sale or other title retention agreement or any lease in the
nature thereof), or any other arrangement pursuant to which title to the property has been
retained by or vested in some other Person for security purposes.

"Loans" has the meaning assigned to the term "Crédits" in the Credit
Agreement.

"Majority Lenders" has the meaning assigned to the term "Majorité des
Prêteurs" in the Credit Agreement.

"New York UCC" means the Uniform Commercial Code as from time to
time in effect in the State of New York.

"Obligations" means (a) the due and punctual payment by the Borrower of
(i) the principal of and interest (including interest accruing during the pendency of any
bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether
allowed or allowable in such proceeding) on the Loans, when and as due, whether at

-2-

# EXHIBIT "B"

maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) all other monetary obligations of the Borrower to any of the Secured Parties under the Credit Agreement and each of the other Finance Documents, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) and (b) the due and punctual performance of all other obligations of the Borrower under or pursuant to the Credit Agreement and each of the other Finance Documents and (c) the due and punctual payment and performance of all the obligations of each other Obligor under or pursuant to this Agreement and each of the other Finance Documents.

"Obligor" means each of the Borrower, US Parent and the Company.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"Pledged Collateral" has the meaning assigned to such term in Section 3.01.

"Pledged Stock" has the meaning assigned to such term in Section 3.01.

"Proceeds" has the meaning specified in Section 9-102 of the New York UCC.

"Secured Parties" means (a) each Lender; (b) the Security Agent; (c) the Agent; (d) the Arranger; and (e) the successors and assigns of each of the foregoing.

"Security Agent" has the meaning assigned to such term in the preamble to this Agreement.

"Security Interest" means the security interest granted by the Company and US Parent, as applicable, in the Collateral to the Security Agent .

"SPA Collateral" has the meaning assigned to such term in Section 2.01.

"Stock Purchase Agreement" means the Stock Purchase Agreement, dated as of September 28, 2007, between the Borrower, US Parent, the Company, and Norman Glazer, David Glazer and George Martin, as sellers, as the same may be amended, modified and supplemented from time to time.

"Trademark Collateral" has the meaning assigned to such term in Section 4.01.

"Trademarks" means all of the following now owned or hereafter acquired by any Grantor: (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress,

-3-

# EXHIBIT "B"

logos, other source or business identifiers, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, and all extensions or renewals thereof and (b) all goodwill associated therewith or symbolized thereby.

"US Parent" has the meaning assigned to such term in the preamble of this Agreement.

## ARTICLE II

### Acquisition Claims

SECTION 2.01.  Grant of Security Interest.  As security for the payment or performance, as the case may be, in full of the Obligations, US Parent hereby assigns, transfers and sets over to the Security Agent, its successors and assigns, for the benefit of the Secured Parties all of its rights to indemnification from Norman Glazer, David Glazer or George Martin, or their successors and assigns (collectively, the "Indemnitors") under the Stock Purchase Agreement (including, but not limited to, its rights under Sections 7 and 8.7 of the Stock Purchase Agreement) (collectively, the "SPA Collateral") and hereby grants to the Security Agent, its successors and assigns, for the benefit of the Secured Parties a continuing security interest in and to all of its rights in, under, and pursuant to the SPA Collateral.  Pursuant to the terms of the Stock Purchase Agreement, the US Parent may recover under such rights to indemnification from the Indemnitors a maximum of $1,000,000 for general claims and $1,500,000 with respect to claims arising out of the acquisition of the assets of Vogue International Displays, subject to the terms of Section 7.2(d) of the Stock Purchase Agreement.

SECTION 2.02.  Enforcement of Claims and Rights.  (a)  The Security Agent shall have the right to institute action and seek redress directly against the Indemnitors for any breach or violation of the Stock Purchase Agreement by the Indemnitors; provided, however, that until an Event of Default has occurred, US Parent shall have the sole right to enforce all of the rights, claims or causes of action that US Parent may have with respect to the SPA Collateral, but only to the extent such enforcement is not inconsistent with the Credit Agreement, and provided further that, any proceeds from such enforcement shall be paid by the Indemnitors directly to the Security Agent for the benefit of the Secured Parties in accordance with the terms of the Credit Agreement.

(b)  Upon and after the occurrence of an Event of Default, the Security Agent may enforce, either in its own name or in the name of US Parent, all rights of US Parent under Section 7 of the Stock Purchase Agreement, including, without limitation, the right to (a) institute binding arbitration to enforce any rights under Section 7 of the Stock Purchase Agreement, (b) compromise or settle any disputed claims as to rights under Section 7 of the Stock Purchase Agreement, (c) give releases or acquittances of

# EXHIBIT "B"

rights under Section 7 of the Stock Purchase Agreement, and/or (d) do any and all things necessary, convenient or proper to fully and completely effectuate the collateral assignment of the rights under the Stock Purchase Agreement pursuant hereto. Upon and after the occurrence of an Event of Default, US Parent hereby constitutes and appoints the Security Agent or the Security Agent's designee as US Parent's attorney-in-fact with full power in US Parent's name, place and stead to do or accomplish any of the aforementioned undertakings and to execute such documents or instruments in the name or stead of US Parent as may be necessary, convenient or proper in the Secured Party's opinion. The aforementioned power of attorney shall be a power of attorney coupled with an interest and irrevocable. If any action is brought by the Security Agent to enforce any rights under Section 7 of the Stock Purchase Agreement, then US Parent agrees to fully cooperate with and assist the Security Agent in the prosecution thereof. Without limiting any other provision of this Agreement, upon and after the occurrence of an Event of Default, US Parent hereby specifically authorizes and directs each of Norman Glazer, David Glazer and George Martin upon written notice to it by the Security Agent to make all payments due under or arising under Section 7 of the Stock Purchase Agreement directly to the Security Agent and hereby irrevocably authorizes and empowers the Security Agent to request, demand, receive, and give acquittance for any and all amounts that may be or become due or payable or remain unpaid at any time and times to US Parent by Norman Glazer, David Glazer or George Martin under and pursuant Section 7 of the Stock Purchase Agreement, and to endorse any checks, drafts or other orders for the payment of money payable to US Parent in payment thereof, and in the Security Agent's discretion to file any claims or take any action or proceeding, either in its own name or in the name of US Parent or otherwise, that the Security Agent may deem necessary or advisable. It is expressly understood and agreed, however, that the Security Agent shall not be required or obligated in any manner to make any demand or to make any inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim or take any other action to collect or enforce the payment of any amounts that may have been assigned to the Security Agent or to which the Security Agent may be entitled hereunder at any time or times.

SECTION 2.03. No Obligation. The Security Agent shall have no obligation or duty to perform any of the obligations of US Parent under the Stock Purchase Agreement, all of which shall remain the sole and exclusive duty and obligation of US Parent.

SECTION 2.04. Authorization. US Parent hereby irrevocably authorizes the Security Agent at any time and from time to time to file in any relevant jurisdiction, without the signature of US Parent, any initial financing statements and amendments thereto that the Security Agent determines to be necessary or advisable to perfect, confirm, continue, enforce or protect the security interest granted by Parent under this Article II, each such financing statement or amendment to name US Parent as debtor and the Security Agent as secured party and to contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction. US Parent agrees to provide such information to the Security Agent promptly upon request.

# EXHIBIT "B"

SECTION 2.05. <u>Covenants of the US Parent</u>. US Parent shall (i) keep the Security Agent informed of all known potential claims with respect to the indemnities made by the Indemnitors to US Parent under the Stock Purchase Agreement, (ii) not, without the consent of the Security Agent (such consent not to be unreasonably withheld), waive any of its material rights or remedies under the Stock Purchase Agreement with respect to such indemnities and (iii) not take or omit to take any action, the taking or omission of which might result in an alteration or impairment of such indemnities or the Security Agent's rights under this Agreement in any material respect adverse to the interests of the Security Agent and the Secured Parties.

ARTICLE III

Pledge of Securities

SECTION 3.01. <u>Pledge.</u> As security for the payment or performance, as the case may be, in full of the Obligations, US Parent hereby assigns and pledges to the Security Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Security Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest in, all of US Parent's right, title and interest in, to and under (a) the shares of common stock of the Company listed on Schedule I, any other Equity Interests of the Company owned by it from time to time and the certificates representing any such Equity Interests (the "<u>Pledged Stock</u>"); (b) all other property that may be delivered to and held by the Security Agent pursuant to the terms of this Section 3.01; (c) subject to Section 3.05, all payments of dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other Proceeds received in respect of the Pledged Stock; (d) subject to Section 3.05, all rights and privileges of US Parent with respect to the Pledged Stock; and (e) all Proceeds of any of the foregoing (the items referred to in clauses (a) through (e) above being collectively referred to as the "<u>Pledged Collateral</u>").

TO HAVE AND TO HOLD the Pledged Collateral, together with all right, title, interest, powers, privileges and preferences pertaining or incidental thereto, unto the Security Agent, its successors and assigns, for the ratable benefit of the Secured Parties, forever; <u>subject</u>, <u>however</u>, to the terms, covenants and conditions hereinafter set forth.

SECTION 3.02. <u>Delivery of the Pledged Collateral.</u> (a) US Parent agrees to deliver or cause to be delivered to the Security Agent on the date hereof all Pledged Stock.

(b) Upon delivery to the Security Agent, (i) all Pledged Stock shall be accompanied by stock powers duly executed in blank or other instruments of transfer satisfactory to the Security Agent and by such other instruments and documents as the Security Agent may reasonably request and (ii) all other property comprising part of the Pledged Collateral shall be accompanied by proper instruments of assignment duly executed by US Parent and such other instruments or documents as the Security Agent may reasonably request. Each delivery of Pledged Stock shall be accompanied by a

-6-

# EXHIBIT "B"

schedule describing the securities, which schedule shall be attached hereto as Schedule I and made a part hereof; provided that failure to attach any such schedule hereto shall not affect the validity of such pledge of such Pledged Stock. Each schedule so delivered shall supplement any prior schedules so delivered.

SECTION 3.03. Representations, Warranties and Covenants. US Parent represents, warrants and covenants to and with the Security Agent, for the benefit of the Secured Parties, that:

(a) Schedule I correctly sets forth the percentage of the issued and outstanding shares of each class of the capital stock of the issuer thereof represented by such Pledged Stock;

(b) except for the security interests granted hereunder and as permitted by the Credit Agreement, US Parent (i) is and will continue to be the direct owner, beneficially and of record, of the Pledged Stock, (ii) holds the same free and clear of all Liens, other than Liens created by this Agreement, (iii) will make no assignment, pledge, hypothecation or transfer of, or create or permit to exist any security interest in or other Lien on, the Pledged Collateral, other than pursuant hereto and under the Credit Agreement, and (iv) subject to Section 3.05, will cause any and all Pledged Collateral, whether for value paid by US Parent or otherwise, to be forthwith deposited with the Security Agent and pledged or assigned hereunder;

(c) except for restrictions and limitations imposed by the Finance Documents or securities laws generally, and except for limitations and restrictions set forth on Schedule 3.03(d), the Pledged Collateral is and will continue to be freely transferable and assignable, and none of the Pledged Collateral is or will be subject to any option, right of first refusal, shareholders agreement, charter or by-law provisions or contractual restriction of any nature that might prohibit, impair, delay or otherwise affect the pledge of such Pledged Collateral hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Security Agent of rights and remedies hereunder;

(d) US Parent (i) has the power and authority to pledge the Pledged Collateral pledged by it hereunder in the manner hereby done or contemplated and (ii) will take reasonable action to defend its title or interest thereto or therein against any and all Liens (other than the Lien created by this Agreement), however arising, of all Persons whomsoever;

(e) no consent of any other Person (including shareholders, partners, members or creditors of US Parent) and no consent or approval of any Governmental Authority, any securities exchange or any other Person was or is necessary to the validity of the pledge effected hereby (other than such as have been obtained and are in full force and effect);

(f) by virtue of the execution and delivery by US Parent of this Agreement, when any Pledged Stock are delivered to the Security Agent in accordance with this Agreement, the Security Agent will obtain a legal, valid and perfected first

-7-

# EXHIBIT "B"

priority lien upon and security interest in such Pledged Stock as security for the payment and performance of the Obligations; and

(g) the pledge effected hereby is effective to vest in the Security Agent, for the benefit of the Secured Parties, the rights of the Security Agent in the Pledged Collateral as set forth herein.

SECTION 3.04.  Registration in Nominee Name; Denominations.  The Security Agent, on behalf of the Secured Parties, shall have the right (in its sole and absolute discretion) to hold the Pledged Stock in its own name as pledgee, the name of its nominee (as pledgee or as sub-agent) or the name of US Parent, endorsed or assigned in blank or in favor of the Security Agent. US Parent will promptly give to the Security Agent copies of any notices or other communications received by it with respect to Pledged Stock. The Security Agent shall at all times have the right to exchange the certificates representing Pledged Stock for certificates of smaller or larger denominations for any purpose consistent with this Agreement.

SECTION 3.05.  Voting Rights; Dividends and Interest, etc.  (a) Unless and until an Event of Default shall have occurred and the Security Agent shall have notified US Parent that their rights under this section are being suspended:

(i) US Parent shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Stock or any part thereof for any purpose consistent with the terms of this Agreement, the Credit Agreement and the other Finance Documents; provided that such rights and powers shall not be exercised in a manner that (x) could be materially prejudicial to the validity or enforceability of the security created hereunder or (y) will cause an Event of Default to occur.

(ii) The Security Agent shall execute and deliver to US Parent, or cause to be executed and delivered to US Parent, all such proxies, powers of attorney and other instruments as US Parent may reasonably request for the purpose of enabling US Parent to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to subparagraph (i) above.

(iii) US Parent shall be entitled to receive and retain any and all dividends and other distributions paid on or distributed in respect of the Pledged Stock to the extent and only to the extent that such dividends and other distributions are permitted by, and otherwise paid or distributed in accordance with, the terms and conditions of the Credit Agreement, the other Finance Documents and applicable laws; provided that any noncash dividends or other distributions that would constitute Pledged Stock, whether resulting from a subdivision, combination or reclassification of the outstanding capital stock of the Company or received in exchange for Pledged Stock or any part thereof, or in redemption thereof, or as a result

**EXHIBIT "B"**

of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Collateral, and, if received by US Parent, shall not be commingled by US Parent with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of the Security Agent and shall be forthwith delivered to the Security Agent in the same form as so received (with any necessary endorsement).

(b)  Upon and after the occurrence of an Event of Default and after the Security Agent shall have notified US Parent of the suspension of their rights under paragraph (a)(iii) of this Section 3.05, all rights of US Parent to dividends or other distributions that US Parent is authorized to receive pursuant to paragraph (a)(iii) of this Section 3.05 shall cease, and all such rights shall thereupon become vested in the Security Agent, which shall have the sole and exclusive right and authority to receive (or direct the receipt of) and retain such dividends or other distributions. All dividends or other distributions received by US Parent contrary to the provisions of this Section 3.05 shall be held in trust for the benefit of the Security Agent, shall be segregated from other property or funds of US Parent and shall be forthwith delivered to the Security Agent upon demand in the same form as so received (with any necessary endorsement).

(c)  Upon and after the occurrence of an Event of Default and after the Security Agent shall have notified the Pledgors of the suspension of their rights under paragraph (a)(i) of this Section 3.05, all rights of US Parent to exercise the voting and consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section 3.05, and the obligations of the Security Agent under paragraph (a)(ii) of this Section 3.05, shall cease, and all such rights shall thereupon become vested in the Security Agent, which shall have the sole and exclusive right and authority to exercise (or direct the exercise of) such voting and consensual rights and powers; provided that, unless otherwise directed by the Majority Lenders, the Security Agent shall have the right from time to time following an Event of Default to permit US Parent to exercise such rights.

(d)  Any notice given by the Security Agent to US Parent suspending its rights under paragraph (a) of this Section 3.05 (i) may be given by telephone if promptly confirmed in writing and (ii) may suspend the rights of US Parent under paragraph (a)(i) or paragraph (a)(iii) in part without suspending all such rights (as specified by the Security Agent in its sole and absolute discretion) and without waiving or otherwise affecting the Security Agent's rights to give additional notices from time to time suspending other rights so long as an Event of Default has occurred.

SECTION 3.06.  Authorization.  US Parent hereby irrevocably authorizes the Security Agent at any time and from time to time to file in any relevant jurisdiction, without the signature of US Parent, any initial financing statements and amendments thereto that the Security Agent determines to be necessary or advisable to perfect, confirm, continue, enforce or protect the security interest granted by US Parent in the Pledged Collateral, each such financing statement or amendment to name US Parent as

-9-

# EXHIBIT "B"

debtor and the Security Agent as secured party and to contain the information required by
Article 9 of the Uniform Commercial Code of each applicable jurisdiction. US Parent
agrees to provide such information to the Security Agent promptly upon request.

ARTICLE IV

Security Interests in Certain Trademarks

SECTION 4.01. Security Interest. (a) As security for the payment or
performance, as the case may be, in full of the Obligations, the Company hereby grants to
the Security Agent, its successors and assigns, for the ratable benefit of the Secured
Parties, a security interest in all right, title or interest of the Company in the Trademarks
listed on Schedule 4.01 to this Agreement (the "Trademark Collateral") and, to the extent
not otherwise included, all Proceeds and products of such Trademarks.

SECTION 4.02. Covenants Regarding Trademark Collateral

(a) The Company (either itself or through its licensees or its
sublicensees) will, for each Trademark constituting Trademark Collateral, (i) maintain
such Trademark in full force, whether at common law or subject to registration, free
from any claim of abandonment or invalidity for non-use, (ii) use commercially
reasonable efforts to maintain the quality of products and services offered under such
Trademark consistent with quality of such products and services as of the effective date
of this Agreement, (iii) display such Trademark with notice of federal or foreign
registration (or, if such Trademark is unregistered, display such Trademark with notice
as required for unregistered Trademarks) to the extent necessary and sufficient to
establish and preserve its maximum rights under applicable law and (iv) not knowingly
use or knowingly permit the use of such Trademark in any violation of any third party
rights.

(b) The Company shall notify the Security Agent promptly if it knows
that any Trademark constituting Trademark Collateral could reasonably be expected to
become challenged, invalidated, abandoned, lost or dedicated to the public, or of any
materially adverse determination or development (including the institution of, or any
such determination or development in, any proceeding in the United States Patent and
Trademark Office or any court or similar office of any country or group of countries)
regarding the Company's ownership of any such Trademark, its right to register the
same, or its right to keep, use and maintain the same.

(c) The Company will take all reasonably necessary steps that are
consistent with the practice in any proceeding before the United States Patent and
Trademark Office or any office or agency in any political subdivision of the United
States or in any other country or group of countries or any political subdivision thereof,
to maintain each registration of Trademarks constituting Trademark Collateral,
including timely filings of applications for renewal, affidavits of use, affidavits of
incontestability and payment of maintenance fees, and, if consistent with good business

# EXHIBIT "B"

judgment, to initiate opposition, interference and cancellation proceedings against third parties.

(d) In the event that the Company knows that any Trademark Collateral has been or is about to be Infringed by a third party, the Company promptly shall notify the Security Agent and shall, if consistent with good business judgment, promptly sue for Infringement and to recover any and all damages for such Infringement (and take any actions required by applicable law prior to instituting such suit), and take such other actions as are appropriate under the circumstances to protect such Trademark Collateral.

(e) Upon repayment of the Loans, the Security Agent and the Lenders will promptly execute and file all documents required by the United States Patent and Trademark Office or other applicable federal, state or local offices responsible for trademarks to release any security interest previously granted hereunder with respect to the Trademark Collateral.

## ARTICLE V

### Representations, Warranties, Covenants and Authorizations

SECTION 5.01.  Authorization to File.  Each Grantor hereby irrevocably authorizes the Security Agent at any time and from time to time to file in any relevant jurisdiction, without the signature of such Grantor, any initial financing statements and amendments thereto that the Security Agent determines to be necessary or advisable to perfect, confirm, continue, enforce or protect the Security Interest granted by such Grantor, each such financing statement or amendment to name such Grantor as debtor and the Security Agent as secured party and to contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction. Each Grantor agrees to provide such information to the Security Agent promptly upon request.

SECTION 5.02.  Representations and Warranties.  The Grantors jointly and severally represent and warrant to the Security Agent and the Secured Parties that:

(a) as of the date hereof, each Grantor has good and valid rights in and title to the Collateral with respect to which it has purported to grant a Security Interest hereunder and has full power and authority to grant to the Security Agent the Security Interest in such Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other Person other than any consent or approval that has been obtained;

(b) Uniform Commercial Code financing statements or other appropriate filings, recordings or registrations containing a description of the Collateral prepared by the Security Agent for filing in the appropriate filing offices have been reviewed by the Grantors and are acknowledged by the Grantors as being complete and correct, and such financing statements, filings, recordings or registrations are all the filings, recordings and registrations (other than filings required to be made in the United States Patent and Trademark Office in order to perfect the Security Interest in Trademark Collateral) that

-11-

# EXHIBIT "B"

are necessary to publish notice of and protect the validity of and to establish a legal, valid and perfected security interest in favor of the Security Agent, for the ratable benefit of the Secured Parties, in respect of all Collateral in which the Security Interest may be perfected by filing, recording or registration in the United States (or any political subdivision thereof) and its territories and possessions, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration is necessary in any such jurisdiction, except as provided under applicable law with respect to the filing of continuation statements.

(c) as of the date hereof, the Security Interest constitutes (i) a legal and valid security interest in the Collateral securing the payment and performance of the Obligations, and (ii) subject to the filings described in Section 4.02(b), a perfected security interest in all Collateral in which a security interest may be perfected by filing, recording or registering a financing statement (or any political subdivision thereof) and its territories and possessions pursuant to the Uniform Commercial Code or other applicable law in such jurisdictions. The Security Interest is and shall be prior to any other Lien on any of the Collateral; and

(d) as of the date hereof, neither of the Grantors has filed or consented to the filing of (i) any financing statement or analogous document under the Uniform Commercial Code or any other applicable laws covering any Collateral, (ii) any assignment in which any Grantor assigns any Trademark Collateral or any security agreement or similar instrument covering any Trademark Collateral with the United States Patent and Trademark Office or (iii) any assignment in which any Grantor assigns any Collateral or any security agreement or similar instrument covering any Collateral with any foreign governmental, municipal or other office, which financing statement or analogous document, assignment, security agreement or similar instrument is still in effect.

SECTION 5.03. Covenants. (a) Each Grantor agrees promptly to notify the Security Agent in writing of any change (i) in its corporate name or any trade name used to identify it in the conduct of its business or in the ownership of its properties, (ii) in the location of its chief executive office, or its principal place of business, (iii) in its identity or type of organization or corporate structure, (iv) in its Federal Taxpayer Identification Number or organizational identification number, (v) in its jurisdiction of organization or (vi) in the ownership of any Pledged Stock. Each Grantor agrees to promptly provide the Security Agent with certified organizational documents reflecting any of the changes described in the preceding sentence. Each Grantor agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Security Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral.

(b) Each Grantor agrees to maintain, at its own cost and expense, such complete and accurate records with respect to the Collateral owned by it as is consistent with its current practices and in accordance with such prudent and standard practices used in industries that are the same as or similar to those in which such Grantor is

-12-

# EXHIBIT "B"

engaged, but in any event to include complete accounting records indicating all payments and proceeds received with respect to any part of the Collateral.

(c) Each Grantor shall, at its own expense, take any and all actions necessary to defend title to the Collateral against all persons and to defend the Security Interest of the Security Agent in the Collateral against any Lien other than the one created by this Agreement.

(d) Each Grantor agrees, at its own expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents and take all such actions as the Security Agent may from time to time request to better assure, preserve, protect and perfect the security interests granted hereunder and the rights and remedies created hereby, including the payment of any fees and taxes required in connection with the execution and delivery of this Agreement, the granting of the security interests and the filing of any financing statements or other documents in connection herewith or therewith.

(e) At its option, the Security Agent may discharge past due taxes, assessments, charges, fees, Liens, security interests or other encumbrances at any time levied or placed on the Collateral, and may pay for the maintenance and preservation of the Collateral to the extent any Grantor fails to do so as required by the Credit Agreement or this Agreement, and each Grantor jointly and severally agrees to reimburse the Security Agent on demand for any payment made or any expense incurred by the Security Agent pursuant to the foregoing authorization; provided, however, that nothing in this Section 5.03(e) shall be interpreted as excusing any Grantor from the performance of, or imposing any obligation on the Security Agent or any Secured Party to cure or perform, any covenants or other promises of any Grantor with respect to taxes, assessments, charges, fees, liens, security interests or other encumbrances and maintenance as set forth herein or in the other Finance Documents.

(f) Each Grantor shall remain liable to observe and perform all the conditions and obligations to be observed and performed by it under each contract, agreement or instrument relating to the Collateral, all in accordance with the terms and conditions thereof, and each Grantor jointly and severally agrees to indemnify and hold harmless the Security Agent and the Secured Parties from and against any and all liability for such performance.

(g) None of the Grantors shall make or permit to be made an assignment, pledge or hypothecation of the Collateral or shall grant any other Lien in respect of the Collateral. None of the Grantors shall make or permit to be made any transfer of the Collateral.

# EXHIBIT "B"

ARTICLE VI

Remedies

SECTION 6.01. Remedies upon Default. Upon and after the occurrence of an Event of Default, each Grantor agrees to deliver each item of Collateral to the Security Agent on demand, and it is agreed that the Security Agent shall have the right to take any of or all the following actions at the same or different times:  (a) with respect to any Trademark Collateral, on demand, to cause the Security Interest to become an assignment, transfer and conveyance of any of or all such Trademark Collateral by the Company to the Security Agent, or to license or sublicense, whether general, special or otherwise, and whether on an exclusive or nonexclusive basis, any such Trademark Collateral throughout the world on such terms and conditions and in such manner as the Security Agent shall determine (other than in violation of any then-existing licensing arrangements to the extent that waivers cannot be obtained), and (b) generally, to exercise any and all rights afforded to a secured party under the Uniform Commercial Code or other applicable law.  Without limiting the generality of the foregoing, each Grantor agrees that the Security Agent shall have the right, subject to the mandatory requirements of applicable law, to sell or otherwise dispose of all or any part of the Collateral, at public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Security Agent shall deem appropriate.  The Security Agent shall be authorized at any such sale (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to persons who will represent and agree that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale the Security Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold.  Each such purchaser at any such sale shall hold the property sold absolutely, free from any claim or right on the part of any Grantor and the Grantors hereby waive (to the extent permitted by law) all rights of redemption, stay and appraisal which such Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

The Security Agent shall give the affected Grantors 10 days' written notice (which each Grantor agrees is reasonable notice within the meaning of Section 9-611 of the Uniform Commercial Code as in effect in the State of New York or its equivalent in other jurisdictions) of the Security Agent's intention to make any sale of Collateral.  Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange.  Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Security Agent may fix and state in the notice (if any) of such sale.  At any such sale, the Collateral or portion thereof to be sold may be sold in one lot as an entirety or in separate parcels, as the Security Agent may (in its sole and absolute discretion) determine.  The Security Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given.  The Security Agent may, without notice or publication,

-14-

# EXHIBIT "B"

adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Security Agent until the sale price is paid by the purchaser or purchasers thereof, but the Security Agent shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice. At any public (or, to the extent permitted by law, private) sale made pursuant to this Section, any Secured Party may bid for or purchase, free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of any Grantor (all said rights being also hereby waived and released to the extent permitted by law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to such Secured Party from any Grantor as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to any Grantor therefor. For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Security Agent shall be free to carry out such sale pursuant to such agreement and no Grantor shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Security Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Obligations paid in full. As an alternative to exercising the power herein conferred upon it, the Security Agent may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. Any sale pursuant to the provisions of this Section 6.01 shall be deemed to conform to the commercially reasonable standards as provided in Section 9-627(b) of the Uniform Commercial Code as in effect in the State of New York or its equivalent in other jurisdictions.

SECTION 6.02. Application of Proceeds. The Security Agent shall have sole and absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement. Upon any sale of Collateral by the Security Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Security Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Security Agent or such officer or be answerable in any way for the misapplication thereof.

SECTION 6.03. Grant of License. Upon and after the occurrence of an Event of Default and for the purpose of enabling the Security Agent to exercise rights and remedies under this Article at such time as the Security Agent shall be lawfully entitled to exercise such rights and remedies, the Company hereby grants to the Security Agent an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to the Company) to use, license or sublicense any of the Trademark

-15-

# EXHIBIT "B"

Collateral. The use of such license by the Security Agent shall be exercised, at the option of the Security Agent, upon and after the occurrence of an Event of Default.

SECTION 6.04. Securities Act, etc. In view of the position of US Parent in relation to the Pledged Stock, or because of other current or future circumstances, a question may arise under the Securities Act of 1933, as now or hereafter in effect, or any similar statute hereafter enacted analogous in purpose or effect (such Act and any such similar statute as from time to time in effect being called the "Federal Securities Laws") with respect to any disposition of the Pledged Stock permitted hereunder. US Parent understands that compliance with the Federal Securities Laws might very strictly limit the course of conduct of the Security Agent if the Security Agent were to attempt to dispose of all or any part of the Pledged Stock, and might also limit the extent to which or the manner in which any subsequent transferee of any Pledged Stock could dispose of the same. Similarly, there may be other legal restrictions or limitations affecting the Security Agent in any attempt to dispose of all or part of the Pledged Stock under applicable blue sky or other state securities laws or similar laws analogous in purpose or effect. US Parent recognizes that in light of such restrictions and limitations the Security Agent may, with respect to any sale of the Pledged Stock, limit the purchasers to those who will agree, among other things, to acquire such Pledged Stock for their own account, for investment, and not with a view to the distribution or resale thereof. US Parent acknowledges and agrees that in light of such restrictions and limitations, the Security Agent, in its sole and absolute discretion (a) may proceed to make such a sale whether or not a registration statement for the purpose of registering such Pledged Stock or part thereof shall have been filed under the Federal Securities Laws and (b) may approach and negotiate with a single potential purchaser to effect such sale. US Parent acknowledges and agrees that any such sale might result in prices and other terms less favorable to the seller than if such sale were a public sale without such restrictions. In the event of any such sale, the Security Agent shall incur no responsibility or liability for selling all or any part of the Pledged Stock at a price that the Security Agent, in its sole and absolute discretion, may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might have been realized if the sale were deferred until after registration as aforesaid or if more than a single purchaser were approached. The provisions of this Section 6.03 will apply notwithstanding the existence of a public or private market upon which the quotations or sales prices may exceed substantially the price at which the Security Agent sells.

ARTICLE VII

Miscellaneous

SECTION 7.01. Notices. All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in clause 16 of the Credit Agreement. The address and telecopy number of each Grantor is set forth on Schedule 7.01.

SECTION 7.02. Security Interest Absolute. All rights of the Security Agent hereunder, the Security Interest, the grant of a security interest in the Collateral

-16-

# EXHIBIT "B"

EXHIBIT "1"
Page 48

and all obligations of each Grantor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Finance Document, any agreement with respect to any of the Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Finance Document or any other agreement or instrument, (c) any exchange, release or non-perfection of any Lien on other collateral, or any release or amendment or waiver of or consent under or departure from any guarantee, securing or guaranteeing all or any of the Obligations or (d) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Grantor in respect of the Obligations or this Agreement.

SECTION 7.03. <u>Survival of Agreement.</u>  All covenants, agreements, representations and warranties made by the Obligors in the Finance Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Finance Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Finance Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Security Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid.

SECTION 7.04. <u>Binding Effect; Several Agreement.</u>  This Agreement shall become effective as to any Grantor when a counterpart hereof executed on behalf of such Grantor shall have been delivered to the Security Agent and a counterpart hereof shall have been executed on behalf of the Security Agent, and thereafter shall be binding upon such Grantor and the Security Agent and their respective successors and assigns, and shall inure to the benefit of such Grantor, the Security Agent and the other Secured Parties and their respective successors and assigns, except that no Grantor shall have the right to assign or transfer its rights or obligations hereunder or any interest herein or in the Collateral (and any such assignment or transfer shall be void) except as expressly contemplated by this Agreement or the Credit Agreement. This Agreement shall be construed as a separate agreement with respect to each Grantor and may be amended, modified, supplemented, waived or released with respect to any Grantor without the approval of any other Grantor and without affecting the obligations of any other Grantor hereunder.

SECTION 7.05. <u>Successors and Assigns.</u>  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successor and assigns of such party; and all covenants, promises and agreements by or on behalf of any Grantor or the Security Agent that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

# EXHIBIT "B"

SECTION 7.06.  Security Agent Appointed Attorney-in-Fact.  Each Grantor hereby appoints the Security Agent the attorney-in-fact of such Grantor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Security Agent may deem necessary or advisable to accomplish the purposes hereof, which appointment is irrevocable and coupled with an interest.  Without limiting the generality of the foregoing, the Security Agent shall have the right, upon and after the occurrence of an Event of Default, with full power of substitution either in the Security Agent's name or in the name of such Grantor (a) with respect to Collateral other than Pledged Collateral, (i) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Collateral or any part thereof; (ii) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Collateral; (iii) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral; (vi) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral; and (viii) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Security Agent were the absolute owner of the Collateral for all purposes; and (b) with Respect to Pledged Collateral (i) to ask for, demand, sue for, collect, receive and give acquittance for any and all moneys due or to become due under and by virtue of any Pledged Collateral; (ii) to endorse checks, drafts, orders and other instruments for the payment of money payable to the Pledgor representing any dividend or other distribution payable in respect of the Pledge Collateral or any part thereof or on account thereof and to give full discharge of the same; (iii) to settle, compromise, prosecute or defend any action, claim or proceeding with respect thereto; and (iv) to sell, assign, endorse, pledge, transfer and to make any agreement respecting, or otherwise deal with, the same; provided, however, that nothing herein contained shall be construed as requiring or obligating the Security Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Security Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby.  The Security Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agent shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or wilful misconduct.

SECTION 7.07.  **GOVERNING LAW.  THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.**

SECTION 7.08.  Waivers; Amendment.  (a)  No failure or delay by the Security Agent, the Agent or any Lender in exercising any right or power hereunder or under any other Finance Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of

-18-

# EXHIBIT "B"

steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Security Agent, the Agent and the Lenders hereunder and under the other Finance Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Finance Document or consent to any departure by any Obligor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Security Agent, any Lender or the Agent may have had notice or knowledge of such Default at the time.

(b) Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Security Agent and the Grantor or Grantors with respect to which such waiver, amendment or modification is to apply, subject to any consent required in accordance with clause 23 of the Credit Agreement.

SECTION 7.09. WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER FINANCE DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 7.10. Severability. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 7.11. Counterparts. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute a single contract (subject to Section 7.04), and shall become effective as provided in Section 7.04. Delivery of an executed signature page to this Agreement by facsimile or electronic scan transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

-19-

# EXHIBIT "B"

SECTION 7.12. Headings. Article and Section headings used herein are for the purpose of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 7.13. Jurisdiction; Consent to Service of Process. (a) Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Finance Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Finance Document shall affect any right that the Security Agent, the Agent or any Lender or any Obligor may otherwise have to bring any action or proceeding relating to this Agreement or any other Finance Document in the courts of any jurisdiction.

(b) Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Finance Document in any court referred to in paragraph (a) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 7.01. Nothing in this Agreement or any other Finance Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 7.14. Termination or Release. (a) This Agreement, and all security interests granted hereby, including, but not limited to, those contained in Article II hereof, shall terminate when all the Obligations have been indefeasibly paid in full and the Lenders have no further commitment to lend under the Credit Agreement.

(b) In connection with any termination or release pursuant to paragraph (a), the Security Agent shall execute and deliver to any Grantor as the case may be, at such Grantor's expense, all documents that such Grantor shall reasonably request to evidence such termination or release. Any execution and delivery of documents pursuant to this Section 7.14 shall be without recourse to or warranty by the Security Agent.

SECTION 7.15. Information. Each Grantor assumes all responsibility for being and keeping itself informed of each Obligor's financial condition and assets, and of

-20-

# EXHIBIT "B"

all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of the risks that such Grantor assumes and incurs hereunder, and agrees that none of the Security Agent or the other Secured Parties will have any duty to advise such Grantor of information known to it or any of them regarding such circumstances or risks.

[Remainder of page intentionally left blank.]

-21-

# EXHIBIT "B"

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

IMC CORPORATION

By: _____
        Name:
        Title:

NORLAINE, INC.

By: _____
        Name:
        Title:

*US Security and Pledge Agreement*

# EXHIBIT "B"

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

IMC CORPORATION

By: _____
　　　　Name:
　　　　Title:

NORLAINE, INC.

By: _____
　　　　Name:
　　　　Title:

*US Security and Pledge Agreement*

# EXHIBIT "B"

SECURITY AGENT:

CREDIT AGRICOLE D'ILE DE FRANCE

By: _____

Name: FREDERIC BOUGON

Title: DIRECTEUR ADJOINT

CENTRE D'AFFAIRES

PARIS - RENNES

*US Security and Pledge Agreement*

Schedule I to the
US Security and Pledge Agreement

## NORLAINE STOCK HELD BY IMC CORPORATION

| Issuer | Number of Certificate | Registered Owner | Number and Class of Shares | Percentage of Shares |
|--------|----------------------|------------------|----------------------------|----------------------|
| Norlaine, Inc. | 6 | IMC Corporation | 100 shares Common Stock | 100% |

10720963_7

# EXHIBIT "B"

Schedule 3.03(d) to the
US Security and Pledge Agreement

None.

# EXHIBIT "B"

Schedule 4.01 to the
US Security and Pledge Agreement

## **TRADEMARKS**

| Trademark Name | Country |
| --- | --- |
| PATINA-V | US |
| PATINA ARTS | US |
| VOGUE INTERNATIONAL | US |

# EXHIBIT "B"

**EXHIBIT "1"**
**Page 59**

ADDRESSES FOR NOTICE

**Company:**

Norlaine, Inc.,
15650 Salt Lake Avenue
City of Industry CA 91745
Facsimile:     33 1 53 17 14 09
Attention:     Sandrine Beltramino

**US Parent:**

IMC Corporation
108 bis avenue Daumesnil
75012 PARIS
FRANCE
Facsimile:     33 1 53 17 14 09
Attention:     Sandrine Beltramino

**Security Agent:**

Caisse Régionale de Crédit Agricole Mutuel de Paris et d'Ile-de-France,
26, quai de la Rapée
75012 PARIS
FRANCE
Facsimile:     33 (0) 1 43 46 24 59
Attention:     Frédéric Bougon

# EXHIBIT "B"

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is **100 Spectrum Center Drive, Suite 600, Irvine, CA 92618**.

A true and correct copy of the foregoing document entitled (*specify*): **AMENDED STIPULATION BETWEEN CHAPTER 7 TRUSTEE AND CREDIT AGRICOLE TO SELL TRADEMARKS AND RELATED GOODWILL OF THE ESTATE FREE AND CLEAR OF LIENS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)  __July 10, 2018__ , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Attorney for Trustee**: Lynda T Bui    lbui@shbllp.com, ecf.filings@shbllp.com
- **Interested Party**:  Howard M Ehrenberg    hehrenberg@sulmeyerlaw.com, hehrenberg@ecf.inforuptcy.com; mviramontes@ecf.inforuptcy.com
- **Chapter 7 Trustee**:  David M Goodrich (TR)    dgoodrich@wgllp.com, c143@ecfcbis.com; dgoodrich11@ecf.epiqsystems.com; lrobles@wgllp.com
- **Attorney for Trustee**:  Brandon J Iskander    biskander@shbllp.com, ncarlson@shbllp.com
- **Accountant for Trustee**: Sam S Leslie    admin@leaaccountancy.com
- **Attorney for Trietsch Property Enterprises, LP** Helen G Long    intake@fastevict.com, fastevict23@fastevict.com
- **Attorney for Debtor**: James R Selth    jim@wsrlaw.net, jselth@yahoo.com;vinnet@ecf.inforuptcy.com
- **Attorney for Trustee**:  Leonard M Shulman    lshulman@shbllp.com
- **Interested Party**:  United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)  __July 10, 2018__ , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Attorney for Credit Agricole (via email)**
Jeffrey C. Krause, Esq.
Gibson, Dunn & Crutcher LLP
Email:  jkrause@gibsondunn.com

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 10, 2018 | Erlanna L. Lohayza | /s/ Erlanna Lohayza |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    F 9013-3.1.PROOF.SERVICE
                                                                Page 61

# EXHIBIT "2"

# ORDER

Leonard M. Shulman – Bar No. 126349
Lynda T. Bui – Bar No. 201002
Brandon J. Iskander – Bar No. 300916
**SHULMAN HODGES & BASTIAN LLP**
100 Spectrum Center Drive, Suite 600
Irvine, California 92618
Telephone:    (949) 340-3400
Facsimile:    (949) 340-3000
Email:        lshulman@shbllp.com; lbui@shbllp.com;
              biskander@shbllp.com

Attorneys for David M. Goodrich,
Chapter 7 Trustee

FILED & ENTERED

AUG 01 2018

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:17-bk-25543-ER |
| **NORLAINE, INC.** dba **Patina-V,** | Chapter 7 |
| Debtor. | **ORDER APPROVING AMENDED STIPULATION BETWEEN CHAPTER 7 TRUSTEE AND CREDIT AGRICOLE TO SELL TRADEMARKS AND RELATED GOODWILL OF THE ESTATE FREE AND CLEAR OF LIENS**<br><br>[No Hearing Set Pursuant to Local Bankruptcy Rule 9013-1(o)] |

The Court having read and reviewed the *Amended Stipulation to Sell Trademarks and Related Goodwill of the Estate Free and Clear of Liens* entered into by and between David M. Goodrich ("Trustee"), the Chapter 7 trustee appointed for the bankruptcy estate ("Estate") of Norlaine, Inc. dba Patina-V, on the one hand, and Caisse Régionale de Crédit Agricole Mutuel de Paris et d'Ile-de-France; aka Crédit Agricole d'Ile de France ("Credit Agricole"), on the other hand ("Stipulation") (docket number 75) filed on July 10, 2018, and it appearing from the *Declaration*

1  *That No Party Requested a Hearing on Motion* filed concurrently herewith that proper notice of the

2  Stipulation has been given and good cause has been shown,

3      **IT IS HEREBY ORDERED** as follows:

4      1.    The Stipulation is approved.

5      2.    The Trustee shall have the right to sell the Trademark Collateral (defined in the

6  Stipulation) free and clear of the liens of Credit Agricole pursuant to Bankruptcy Code § 363(f)(2)

7  pursuant to the terms of the Stipulation for not less than $80,000 and in exchange for the Trustee's

8  commitment to a pay to Credit Agricole promptly after receipt of the gross proceeds from the sale,

9  the following amounts: (a) $60,000 of the first $80,000 in gross proceeds received by the Trustee;

10  (b) 50% of the gross proceeds between $85,000 and $200,000; and (c) 80% of the gross proceeds in

11  excess of $200,000.

12      3.    The Trustee shall have the right to retain for the benefit of the Debtor's estate from

13  the gross proceeds of sale of the Trademark Collateral the following: (a) $20,000 of the first $80,000

14  in gross proceeds received; (b) 100% of the next $5,000 in gross proceeds from $80,000 to $85,000;

15  (c) 50% of the gross proceeds between $85,000 and $200,000; and (d) 20% of the gross proceeds in

16  excess of $200,000.  The Trustee's costs and any related fees and expenses in connection with the

17  sale will be paid from the Trustee's share of the gross proceeds.

18      4.    All proceeds received by Credit Agricole will be applied to reduce the Proof of Claim

19  that it filed on April 19, 2018 in the amount of $926,593.90.

20                           # # #

23

24  Date: August 1, 2018

                              Ernest M. Robles
                              United States Bankruptcy Judge

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

5405-000\92\1251228.1                2                **EXHIBIT "2"**
                                                   **Page 64**

# EXHIBIT "3"

# PURCHASE AGREEMENT

## ASSET PURCHASE AND SALE AGREEMENT

THIS ASSET PURCHASE AND SALE AGREEMENT ("Agreement") is entered into as of August $\underline{14}$, 2018, by and between CNL Mannequins ("Buyer") and David M. Goodrich, solely in his capacity as Chapter 7 trustee ("Seller" or "Trustee") for the bankruptcy estate ("Estate") Norlaine, Inc. dba Patina-V (the "Debtor").

### RECITALS

WHEREAS, on December 22, 2017 ("Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of United States Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, Los Angeles Division ("Bankruptcy Court") as Case No. 2:17-bk-25543-ER ("Bankruptcy Case");

WHEREAS, David M. Goodrich is the duly appointed, qualified and acting Chapter 7 trustee for the Debtor's Estate;

WHEREAS, in its Schedule A/B filed on December 22, 2017 (docket number 1), the Debtor lists an interest in "Trademark Patina-V" and that the value is "unknown." Also in its Schedule A/B, the Debtor lists an interest in the website/domain name "www.patinav.com" and that the value is "$0.00" (the "Website").

WHEREAS, pursuant to the website for the United States Patent and Trademark Office, it appears that the Debtor owned (1) the word mark registered as "Patina-V", serial number 87481155; (2) the word mark registered as "Patina-V", serial number 77619170; and (3) the word mark registered as "Patina Arts", serial number 77619232 (collectively, the "Trademarks").

WHEREAS, on or about September 28, 2007, the Debtor and its parent corporation, IMC Corporation, entered into the *US Security and Pledge Agreement* pursuant to which the Debtor granted to Caisse Régionale de Crédit Agricole Mutuel de Paris et d'Ile-de-France; aka Crédit Agricole d'Ile de France ("Credit Agricole") a security interest in the Trademarks, including an interest in the trademark Vogue International (collectively with the Website and the Trademarks, the "Trademark Assets");

WHEREAS, the Trustee and Credit Agricole have entered into the *Amended Stipulation to Sell Trademarks and Related Goodwill of the Estate Free and Clear of Liens* ("Stipulation") which provides that the Trustee shall have the right to sell the Trademark Assets free and clear of Credit Agricole's lien for not less than $80,000 and provides a distribution scheme for the payment of the gross proceeds received from said sale;

WHEREAS, pursuant to Court Order entered August 1, 2018, the Stipulation was approved;

**EXHIBIT "3"**
**Page 66**

WHEREAS, subject to the approval of the Bankruptcy Court, Buyer desires to purchase all rights/ownership from Seller, and Seller desires to sell to Buyer all rights/ownership of the Trademark Assets;

WHEREAS, the sale of the Trademark Assets will be on an "as is" and "where is" basis, without any representations or warranties of any kind, subject to any and all existing liens, encumbrances and/or outstanding liabilities; and

WHEREAS, pursuant to 11 U.S.C. Section 363, the Trustee and/or his attorneys will seek a Court Order authorizing the sale of the Trademark Assets.

## 1.    Purchase and Sale.

NOW THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, the adequacy of which is hereby acknowledged by each Party, and in consideration of the mutual promises and covenants set forth below, the Parties agree as follows:

1.1    Agreement to Purchase.  Subject to the terms and conditions of this Agreement, Buyer agrees to purchase at the Closing (as defined herein), and Seller agrees to sell to Buyer at the Closing, for the purchase price set forth in Section 1.2 below, the Trademark Assets, including any and all social media presence and related goodwill associated therewith.

1.2    Purchase Price.  The Trustee agrees to sell, and the Buyer agrees to purchase, the Trademark Assets being sold pursuant to Section 1.1 on an "as is" and "where is" basis, without any warranties either express or implied, for Eighty Thousand Dollars ($80,000.00) (the "Purchase Price") or an amount as increased by successful overbid to be paid by the Buyer (provided the Buyer is the successful bidder) upon the entry of a Final Order. The Purchase Price shall be paid in Good Funds (defined below) as follows:

(a)    Concurrently with the mutual execution and delivery of this Agreement (the date of such mutual execution and delivery is referred to herein as the "Execution Date"), Buyer shall deposit the sum of Five Thousand Dollars ($5,000.00) ("Buyer's Deposit") with the Trustee. The Buyer's Deposit shall be paid in Good Funds (defined below) and made payable to "David M. Goodrich, Chapter 7 Trustee for the bankruptcy estate of Norlaine, Inc." and shall be mailed to the attention of David M. Goodrich, Chapter 7 Trustee, 650 Town Center Drive, Suite 600, Costa Mesa, CA 92626.  At the Closing, Buyer's Deposit shall be credited toward payment of the Purchase Price.  For purposes of this Agreement, "Good Funds" shall mean immediately available funds in the form of cash or wire transfer of funds.

(b)    No later than one (1) day prior to the Closing Date, Buyer shall deliver the Trustee, in Good Funds, the Purchase Price less Buyer's Deposit.  Purchase Price less the Buyer's Deposit shall be paid in Good Funds and made payable to "David M. Goodrich, Chapter 7 Trustee for the bankruptcy estate of Norlaine, Inc." and shall be mailed to the attention of David M. Goodrich, Chapter 7 Trustee, 650 Town Center Drive, Suite 600, Costa Mesa, CA 92626.

EXHIBIT "3"
Page 67

(c)    Buyer's Deposit shall be non-refundable except upon the occurrence of any of the following events: (i) Buyer is not the approved Buyer at the hearing on the Sale Motion (as defined herein), (ii) Buyer is overbid and such overbid receives Bankruptcy Court approval and proceeds to closing, (iii) the termination of this Agreement for any reason other than Buyer's default or breach of this Agreement, or (iv) Seller's inability to consummate the transaction contemplated by this Agreement, and in any of such events, the Trustee shall return Buyer's Deposit to Buyer. At the Closing, Buyer's Deposit shall be credited toward payment of the Purchase Price.

## 2.    Closing; Deliveries at the Closing.

2.1    Closing.    The closing of the purchase and sale of the Trademark Assets as contemplated by this Agreement (referred to throughout this Agreement as the "Closing") shall take place at the offices of Shulman Hodges & Bastian LLP, located at 100 Spectrum Center Drive, Suite 600, Irvine, California.  The Closing shall be held within fifteen (15) days after the Bankruptcy Court enters an order approving the sale of the Trademark Assets unless otherwise approved by the Trustee (referred to throughout this Agreement as the "Closing Date").

2.2    Deliveries at the Closing.

(a)    Deliveries by Buyer.  No later than one (1) day prior to the Closing Date, Buyer shall deliver, or cause to be delivered to the Trustee, in Good Funds, the Purchase Price less Buyer's Deposit.

(b)    Deliveries by Seller.    At Closing, Seller shall deliver to Buyer the following:

(1) an original Bill of Sale in the form attached hereto as Exhibit A, executed by the Seller dated as of the Closing Date;

(2) a copy of the Court order approving the sale of the Trademark Assets; and

(3) such additional documentation as Buyer may reasonably request to consummate the transaction contemplated hereby.

## 3.    Bankruptcy Covenants.

3.1    Entry of Sale Approval Order.  No later than two (2) business days after execution of this Agreement by the parties hereto, Seller shall file a motion reasonably acceptable to Buyer (the "Sale Motion") with the Bankruptcy Court seeking entry of an order in form and substance satisfactory to Buyer which shall contain, without limitation, the following provisions (the "Sale Approval Order"):

5405-000\1254276.1

EXHIBIT "3"
Page 68

(a)    approving the terms and conditions of this Agreement and the sale of the Trademark Assets to Buyer;

(b)    requesting approval of overbid procedures;

(c)    finding that the Purchase Price constitutes fair value for the Trademark Assets;

(d)    finding that notice of the transactions contemplated hereby and of the terms of this Agreement was good and sufficient and was provided timely to all creditors and parties-in-interest, including, without limitation, any and all creditors holding liens or encumbrances on the Trademark Assets;

(e)    authorizing and directing the Trustee to consummate the transactions contemplated by this Agreement and to comply in all respects with the terms of this Agreement; and

(f)    finding that the transactions contemplated by this Agreement were negotiated at arm's length, that Buyer acted in good faith in all respects, and that the Buyer is entitled to the protections of Section 363(m) of the Bankruptcy Code.

3.2    Overbid Procedures.  Potential bidders must bin an initial amount of at least $5,000.00 over the Purchase Price or $85,000.00.  Minimum bid increments thereafter shall be $500.00.  Subject to approval of the Court, the Trustee shall have sole discretion in determining (a) the other procedures to be utilized for bidding; and (b) which overbid is the best for the Estate.

3.3    Subject to Bankruptcy Court Approval.  Seller shall use its best efforts to cause the Bankruptcy Court to enter the Sale Approval Order.  The Agreement is expressly contingent upon the Seller obtaining Bankruptcy Court approval of the sale of the Trademark Assets with a finding that Buyer is in good faith pursuant to Bankruptcy Code section 363(m).  The Seller makes no warranties, either express or implied, as to his ability to obtain approval of the Bankruptcy Court and entry of a Sale Approval Order, and in the event that the Seller is unable to obtain said approval and Sale Approval Order, Buyer and its officers, directors, shareholders, agents, successors and assigns shall hold Seller and its attorneys and agents harmless from any and all damages which Buyer may allege he has suffered as a result therefrom.  Buyer's Deposit shall be immediately refunded in the event such approval is not obtained.

4.    **Representations and Warranties of Seller.**  Seller hereby represents and warrants to Buyer that the following are true and correct as of the date hereof and will be true as of the Closing (except as otherwise specifically and expressly permitted under this Agreement).

4.1    Authorization.  Subject to the Bankruptcy Court approval of this Agreement and all other documents to be executed by Seller and delivered to Buyer prior to or at the Closing, Seller has full power and authority to enter into this Agreement and has duly authorized, executed and delivered the same.  The Agreement, when executed and delivered by Seller, will

constitute valid and legally binding obligations of Seller, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, or (b) as limited by laws relating to the availability of a specific performance, injunctive relief, or other equitable remedies.

5.    **Representations and Warranties of the Buyer.**  Buyer hereby represents and warrants to Seller that:

5.1    <u>Authorization</u>.  Buyer has full power and authority to enter into this Agreement and has duly authorized, executed and delivered the same.  The Agreement, when executed and delivered by Buyer, will constitute valid and legally binding obligations of the Buyer, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, or (b) as limited by laws relating to the availability of a specific performance, injunctive relief, or other equitable remedies.

5.2    <u>Satisfactory Due Diligence</u>.  Buyer is not relying on any representations and warranties of Buyer (except as provided herein), whether oral or written, and has acknowledged that it has satisfied itself with its due diligence review of the Trademark Assets.

6.    **Conditions to Buyer's Obligation to Close.**  The obligations of Buyer to Seller under this Agreement are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

6.1    <u>Representations and Warranties</u>.  The limited representations and warranties of Seller contained in Section 4 above, shall be true and correct on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the date of the Closing.

6.2    <u>Performance</u>.  All covenants, agreements and conditions contained in this Agreement to be performed by Seller on or prior to the Closing shall have been performed or complied with in all material respects.

6.3    <u>Bankruptcy Court Matters</u>.  The Bankruptcy Court shall have entered the Sale Approval Order, and the Sale Approval Order shall not have been vacated, stayed, reversed, or modified, amended, or supplemented in any manner.

7.    **Conditions to the Obligations of Seller.**  The obligations of Seller to Buyer under this Agreement are subject to the fulfillment, on or before the Closing, of each of the following conditions, unless otherwise waived:

7.1    <u>Representations and Warranties</u>.  The representations and warranties of Buyer contained in Section 5 shall be true and correct in all material respects on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the Closing.

7.2    <u>Performance</u>.    All covenants, agreements and conditions contained in this Agreement to be performed by Buyer on or prior to the Closing shall have been performed or complied with in all material respects.

7.3    <u>Bankruptcy Court Matters</u>.  The Bankruptcy Court shall have entered the Sale Approval Order, and the Sale Approval Order shall not have been vacated, stayed, reversed, or modified, amended, or supplemented in any manner.

7.4    <u>Payment of Purchase Price</u>.  Buyer shall deliver the Purchase Price in Good Funds as set forth in Section 1.2 of this Agreement.

8.    **Miscellaneous**.

8.1    <u>As Is/Where Is</u>.  The Seller shall sell, transfer, convey and deliver to Buyer the Trademark Assets on an "as is" and "where is" basis, without any representations or warranties of any kind, except as expressly set forth herein.

8.2    <u>Waiver</u>.  Buyer hereby acknowledges and waives any and all claims, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature and interests in the Trademark Assets being sold to Buyer pursuant to this Agreement; and the Purchase Price shall not be subject to any offset, decrease, reductions, deductions, or counterclaim of any kind or nature whatsoever.

8.3    <u>Additional Agreements; Reasonable Efforts</u>.  Subject to the terms and conditions of this Agreement, the Parties agree to use all commercially reasonable efforts to take, or cause to be taken, action and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement, including cooperating fully with the other Party and providing to the other Party any information reasonably required.  In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, the Parties shall take all such necessary action.

8.4    <u>Expenses</u>.  Except as set forth to the contrary in this Agreement, each of the Parties hereto shall be responsible for its own fees and expenses, including, but not limited to, fees and expenses with respect to the engagement of outside accountants and attorneys, incurred by it in connection with this Agreement and the transactions contemplated with respect to this Agreement.

8.5    <u>Entire Agreement; Amendments</u>.  This Agreement, and the documents referred to herein constitute the entire agreement between the parties hereto pertaining to the subject matter hereof, and any and all other written or oral agreements relating to the subject matter hereof existing between the parties hereto are expressly canceled.

8.6    Effect of Headings:   The titles and headings of this Agreement are for convenience and identification only, and shall not be deemed to limit, amplify, or define the contents of the respective sections or paragraphs to which they pertain.

8.7    Counterparts.   This Agreement may be executed in one or more Counter-parts (multiple signatures) each of which shall be deemed an original, and all of which constitute one and the same instrument.

8.8    Invalidity.   In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, by held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement or any other such instrument.

8.9    Attorneys' Fees.   If any legal action is brought for the enforcement of this Agreement or because of any alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, each party shall bear their own legal costs and expenses, and the prevailing party shall not be entitled to an award of its fees from the other party.

8.10    Governing Law.   This Agreement is to be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the State of California shall govern, without giving effect to principles of conflicts of law.

8.11    Jurisdiction of the Bankruptcy Court.   Any and all disputes which involve in any manner the Estate or the Trustee, arising from the Agreement or relating in any manner to the Property, shall be resolved only in the United States Bankruptcy Court, Central District of California, Los Angeles Division.

8.12    Knowing and Voluntary Agreement.   Each Party hereto acknowledges that it has entered into this Agreement knowingly and voluntarily of its own free will and under no duress of any nature.

8.13    Survival of Warranties.   Unless otherwise set forth in this Agreement, the warranties, representations and covenants of Seller and Buyer contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing.

8.14    Successors and Assigns.   This Agreement shall inure to the benefit of, and shall be binding upon the Parties, and each of them, and their respective successors, assigns, heirs, partners, agents, officers, corporations, partnerships, partners, shareholders, representatives, and each of them.

8.15    Amendments and Waivers.  Any term of this Agreement may be amended or waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the parties hereto.

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be executed on its behalf by its officer thereunto duly authorized, all on or as of the day and year first above written.

**SELLER:**

Dated: August  7 , 2018

_____

David M. Goodrich, solely in his capacity as the Chapter 7 trustee for the bankruptcy estate of Norlaine, Inc. dba Patina-V

**BUYER:**

**CNL MANNEQUINS**

Dated: August 13 , 2018

_____
By:    James Chiao
Its:         PRESIDENT

**APPROVED AS TO CONTENT AND FORM:**

**SHULMAN HODGES & BASTIAN LLP**

/s/ Brandon J. Iskander

Dated: August 14 , 2018

_____
Leonard M. Shulman
Lynda T. Bui
Brandon J. Iskander
Attorneys for David M. Goodrich, Chapter 7 Trustee

## EXHIBIT A

## FORM OF BILL OF SALE

THIS BILL OF SALE (this "Bill of Sale"), dated as of [_____], 2018, is entered into between David M. Goodrich in his capacity as the Chapter 7 trustee ("Trustee" or "Seller") for the bankruptcy estate of Norlaine, Inc. dba Patina-V ("Debtor"), and _____, ("Buyer").

For good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, Seller does give, grant, bargain, sell, transfer, assign, convey and deliver to Buyer, all of the following, collectively defined as the "Trademark Assets":    (1) the website/domain name www.patinav.com; (2) the word mark registered as "Patina-V", serial number 87481155; (3) the word mark registered as "Patina-V", serial number 77619170; (4) the word mark registered as "Patina Arts", serial number 77619232; and (5) the interest of the Debtor in the trademark Vogue International.  All capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase and Settlement Agreement dated as of August _____, 2018 between, inter alia, Seller and Buyer.

Seller hereby covenants that it will, upon reasonable written request therefor and at Buyer's sole cost and expense, execute and deliver such other documents; and do such other acts and things, all as Buyer, its nominees, successors and/or assigns may reasonably request in order to fully assign and transfer to and vest in Buyer, its nominees, successors and/or assigns, and protect its or their rights, title and interest in and enjoyment of, all of the assets of such Seller intended to be transferred and assigned hereby.

All references to "Seller" and "Buyer" herein shall be deemed to include their respective designees, nominees, successors and/or assigns, where the context permits.

This Bill of Sale is governed by the laws of the State of California without regard to its conflicts of law principles that would cause the application of the laws of another jurisdiction.

### [SIGNATURES CONTINUED ON FOLLOWING PAGE]

**IN WITNESS WHEREOF,** the parties hereto have executed this Bill of Sale as of the date first written above.

SELLER:

_____

David M. Goodrich
Chapter 7 Trustee for the bankrutpcy estate
of Norlaine, Inc. dba Patina-V

**BUYER:**

By: _____
Name:_____
Title:_____

EXHIBIT "3"
Page 75

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: **100 Spectrum Center Drive, Suite 600, Irvine, California  92618**

A true and correct copy of the foregoing document entitled (*specify*): **CHAPTER 7 TRUSTEE'S MOTION FOR ORDER: (1) APPROVING THE SALE OF PERSONAL PROPERTY OF THE ESTATE (TRADEMARKS) PURSUANT TO BANKRUPTCY CODE §363(b)(1) AND (f), SUBJECT TO OVERBIDS, COMBINED WITH NOTICE OF BIDDING PROCEDURES AND REQUEST FOR APPROVAL OF THE BIDDING PROCEDURES UTILIZED; AND (2) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF DAVID M. GOODRICH IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **August 14, 2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Attorney for Trustee**: Lynda T Bui    lbui@shbllp.com, ecf.filings@shbllp.com
- **Interested Party**:  Howard M Ehrenberg    hehrenberg@sulmeyerlaw.com, hehrenberg@ecf.inforuptcy.com; mviramontes@ecf.inforuptcy.com
- **Chapter 7 Trustee**:  David M Goodrich (TR)    dgoodrich@wgllp.com, c143@ecfcbis.com; dgoodrich11@ecf.epiqsystems.com; lrobles@wgllp.com
- **Attorney for Trustee**:  Brandon J Iskander    biskander@shbllp.com, ncarlson@shbllp.com
- **Accountant for Trustee**: Sam S Leslie    admin@leaaccountancy.com
- **Attorney for Trietsch Property Enterprises, LP** Helen G Long    intake@fastevict.com, fastevict23@fastevict.com
- **Attorney for Debtor**:  James R Selth    jim@wsrlaw.net, jselth@yahoo.com;vinnet@ecf.inforuptcy.com
- **Attorney for Trustee**:  Leonard M Shulman    lshulman@shbllp.com
- **Interested Party**:  United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*)  **August 14, 2018**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **August 14, 2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 14, 2018 | Erlanna Lohayza | */s/ Erlanna Lohayza* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**VIA EMAIL SERVICE**

**Interested Parties**:

Richard Levy, Jr.
Email: rlevy@pryorcashman.com

Kumail Khalfan
Email: kumail@formeinternational.com

Geoffrey Delpy
Email: geoffrey@formeinternational.com

Thomas Reistetter
Silvestri
Email: trestetter@silverstricalifornia.com

Scott Kohn
Email: scott@investccl.com

**VIA U.S. MAIL SERVICE**

**Judge's Copy**
U.S. Bankruptcy Court
Attn: Honorable Ernest M. Robles
255 E. Temple Street, Suite 1560
Los Angeles, CA 90012

**Buyer**:
CNL Mannequins
Attn:  James Chiao
6600 Artesia Blvd.
Buena Park, CA  90620

**CONTINUED ON ATTACHED LIST**

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**

**COURT MAILING LIST**
EMPLOYMENT DEVELOPMENT
DEPT.
BANKRUPTCY GROUP MIC 92E
P.O. BOX 826880
SACRAMENTO, CA 94280-0001

**CLAIM FILED**
FRANCHISE TAX BOARD
BANKRUPTCY SECTION MS: A-340
P.O. BOX 2952
SACRAMENTO, CA 95812-2952

**CLAIM FILED**
LOS ANGELES CO TREASURER AND
TAX COLLECTOR
PO BOX 54110
LOS ANGELES, CA  90054

**COURT MAILING LIST**
LOS ANGELES CITY CLERK
P.O. BOX 53200
LOS ANGELES, CA 90053-0200

**COURT MAILING LIST**
TRIETSCH PROPERTY
ENTERPRISES, LP
HG LONG & ASSOCIATES
474 W ORANGE SHOW ROAD
SAN BERNARDINO, CA 92408-2030

**COURT MAILING LIST**
ABLE INDUSTRIAL
2006 S. BAKER AVE.
ONTARIO, CA 91761-7709

**COURT MAILING LIST**
AFLAC, INC.
1932 WYNNTON RD.
COLUMBUS, OH 31999-7000

**COURT MAILING LIST**
AIRESPRING, INC.
7800 WOODLEY AVE.
VAN NUYS, CA 91406-1722

**CLAIM FILED**
ANNEX WALNUT AUTOMOTIVE
COLORS
17999 E VALLEY BLVD
CITY OF INDUSTRY, CA 91744

**COURT MAILING LIST**
ANTONIO CANDELARIA
12740 PUTNAM ST.
WHITTIER, CA 90602-3211

**CLAIM FILED**
APP WINDDOWN C/ ASK LLP
2600 EAGAN WOODS DR STE 400
ST PAUL, MN 55121

**COURT MAILING LIST**
ARMANDO CANDIA
122 S. LORENA STREET APT. 7
LOS ANGELES, CA 90063-3068

**COURT MAILING LIST**
ATHENS SERVICES
P.O. BOX 60009
CITY OF INDUSTRY, CA 91716-
0009

**COURT MAILING LIST**
AZUSA LIGHT & WATER
P.O. BOX 7030
ARTESIA, CA 90702-7030

**COURT MAILING LIST**
BETHANY RUBIS
ASK, LLP
2600 EAGEN WOODS DR., STE 400
ST. PAUL, MN 55121-1169

**COURT MAILING LIST**
BLANCA DUE EZ
9715 AERO DR.
PICO RIVERA, CA 90660-4707

**COURT MAILING LIST**
C & O MANUFACTURING, INC.
9640 BEVERLY RD.
PICO RIVERA, CA 90660-2137

**COURT MAILING LIST**
CMC PRODUCTS
P.O. BOX 775287
CHICAGO, IL 60677-5287

**COURT MAILING LIST**
CMC PRODUCTS AND
SERVICES
5401 S. KIRKMAN RD., STE 105
ORLANDO, FL 32819-7937

**COURT MAILING LIST**
CRF SOLUTIONS
P.O. BOX 1389
SIMI VALLEY, CA 93062-1389

**COURT MAILING LIST**
CAISSE REGIONALE DE CREDIT
AGRICOLE
26, QUAI DE LA RAPEE
PARIS, 75012
FRANCE

**CLAIM FILED**
CAISSE REGIONALE DE CREDIT
AGRICOLE
MUTUEL DE PARIS ET D'ILE-DE-
FRANCE
C/O GIBSON DUNN &
CRUTCHER LLP
ATTN JEFFREY C KRAUSE ESQ
333 S GRAND AVE, 46TH FL
LOS ANGELES, CA 90071

**COURT MAILING LIST**
CALIFORNIA DEPT. OF TAX AND
FEE ADM
ACCOUNT INFORMATION GROUP
MIC:29
P.O. BOX 942879
SACRAMENTO, CA 94279-0029

**CLAIM FILED**
CALIFORNIA DEPT. OF TAX AND FEE
ADM
PO BOX 942879
SACRAMENTO, CA 94279-0055

**COURT MAILING LIST**
CARLOS RENTERIA
10324 SAN LUIS AVE.
SOUTH GATE, CA 90280-6626

**COURT MAILING LIST**
CAROL CRISANTO
5017 CHURCH ST., UNIT A
PICO RIVERA, CA 90660-2807

**COURT MAILING LIST**
COFRAD SA
12 RUE VAUVILLIERS
PARIS, 75001
FRANCE

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**CLAIM FILED**
COFRAD SA
C/O THE YITZHAK LAW GROUP
ERICA T YITZHAK ESQ
17 BARSTOW ROAD, SUITE 406
GREAT NECK, NY 11021

**COURT MAILING LIST**
COPIER EXPO, INC.
1238 E. LEXINGTON AVE.
POMONA, CA 91766-5561

**CLAIM FILED**
CREST PRINT
1064 E. CYPRESS ST.
COVINA, CA 91724-2017

**COURT MAILING LIST**
CRUSER MITCHELL
275 SCIENTIFIC DR.
NORCROSS, GA 30092-3319

**COURT MAILING LIST**
DI CENTRAL CORPORATION
1199 NASA PARKWAY, SUITE 101
HOUSTON, TX 77058-3301

**COURT MAILING LIST**
DANIEL RAMOS
13206 BAXTER SPRINGS DR.
RANCHO CUCAMONGA, CA 91739-9256

**COURT MAILING LIST**
DANIEL RAMOS
6266 FERGUSON DR.
COMMERCE, CA 90022-5329

**COURT MAILING LIST**
ENVIRO-GUARD
2348 CEBU CT.
PLACENTIA, CA 92870-1709

**COURT MAILING LIST**
ERIKA HERNANDEZ
1049 HARRIS AVE.
LOS ANGELES, CA 90063-1733

**COURT MAILING LIST**
ERNEST PACKAGING
SOLUTIONS
5777 SMITHWAY ST.
COMMERCE, CA 90040-1507

**COURT MAILING LIST**
EVERARDO RUIZ LUZ
678 W. 28TH ST.
SAN BERNARDINO, CA 92405-3328

**COURT MAILING LIST**
FEDERAL EXPRESS
P.O. BOX 7221
PASADENA, CA 91109-7321

**COURT MAILING LIST**
FINANCIERE COFRAD
12 RUE VAUVILLIERS
PARIS, 75001
FRANCE

**COURT MAILING LIST**
FLORIDA DEPARTMENT OF
REVENUE
5050 W. TENNESSEE ST.
TALAHASSEE, FL 32399-0100

**COURT MAILING LIST**
GLOBAL SHOP/EMERALD EXPO
32694 COLLECTION CENTER DR.
CHICAGO, IL 60693-0326

**COURT MAILING LIST**
GRAINGER, INC.
DEPT. 813600186
PALATINE, IL 60038-0001

**COURT MAILING LIST**
GUARDIAN
P.O. BOX 824404
PHILADELPHIA, PA 19182-4404

**COURT MAILING LIST**
HASSETT EXPRESS
18W100 22ND ST., SUITE 109
OAKBROOK TERRACE, IL 60181-4448

**COURT MAILING LIST**
HEALTH NET
FILE #52617
LOS ANGELES, CA 90074-2617

**COURT MAILING LIST**
HEMPHILL, GREEN & ASSOCIATES
P.O. BOX 2212
SISTERS, OR 97759-2212

**COURT MAILING LIST**
HERNANDEZ GARDENING-
LANDSCAPING
4230 BRESEE AVE.
BALDWIN PARK, CA 91706-3006

**COURT MAILING LIST**
HURON-CHEM TREND
22002 NETWORK PL.
CHICAGO, IL 60673-1220

**COURT MAILING LIST**
IPS ACCELLA POLYURETHANE
SYSTEMS
P.O. BOX 953546
ST. LOUIS, MO 63195-3546

**CLAIM FILED**
IPS ACCELLA POLYURETHANE
SYSTEMS
2500 ADIE ROAD
MARYLAND HEIGHTS, MO 63043

**COURT MAILING LIST**
INSURANCE COMPANY OF THE
WEST
P.O. BOX 509039
SAN DIEGO, CA 92150-9039

**CLAIM FILED**
INSURANCE COMPANY OF THE
WEST
15025 INNOVATION DRIVE
SAN DIEGO, CA 92128

**CLAIM FILED**
INTERNAL REVENUE SERVICE
P.O. BOX 7346
PHILADELPHIA, PA 19101-7346

**CLAIM FILED**
IPFS CORPORATION
30 MONTGOMERY STREET,
SUITE 1000
JERSEY CITY, NJ 07302

**COURT MAILING LIST**
JS CONSULTANTS, INC.
1119 MILLIKEN AVE., SUITE B
ONTARIO, CA 91761-8108

**CLAIM FILED**
JS CONSULTANTS, INC.
C/O COFACE NORTH AMERICA
INSURANCE COMPANY
650 COLLEGE RD EAST, STE 2005
PRINCETON, NJ 08540

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

**COURT MAILING LIST**
JACK BRESLAVSKY
HINDEN & BRESLAVSKY
4661 W. PICO BL.
LOS ANGELES, CA 90019-4237

**CLAIM FILED**
JACKSON LEWIS P.C.
1133 WESTCHESTER AVENUE
SUITE S125
WEST HARRISON NY 10604-3516

**COURT MAILING LIST**
JACKSON LEWIS P.C.
725 S. FIGUEROA ST., SUITE 2500
LOS ANGELES, CA 90017-5408

**COURT MAILING LIST**
JACKSON LEWIS P.C.
P.O. BOX 416019
BOSTON, MA 02241-6019

**COURT MAILING LIST**
JAY K. LEVY & ASSOCIATES
ATTORNEY DIRECT
COLLECTIONS, INC.
P.O. BOX 336
HIGHLAND PARK, IL 60035-0336

**COURT MAILING LIST**
JEAN CHRISTOPHE GUILBAUD
9833 VICAR ST.
LOS ANGELES, CA 90034-2718

**COURT MAILING LIST**
JORGE RODRIGUEZ HERRERA
1049 HARRIS AVE.
LOS ANGELES, CA 90063-1733

**COURT MAILING LIST**
JOSE JUAREZ
10341 OAKWOOD AVE.
HESPERIA, CA 92345-2727

**COURT MAILING LIST**
KESLUK, SILVERSTEIN & JACOB
9255 SUNSET BLVD., SUITE 411
WEST HOLLYWOOD, CA 90069-3302

**COURT MAILING LIST**
KLINGSPOR
P.O. BOX 2367
HICKORY, NC 28603-2367

**COURT MAILING LIST**
LAGUNA CLAY COMPANY
14400 LOMITAS AVE.
CITY OF INDUSTRY, CA 91746-3018

**COURT MAILING LIST**
LOPEZ MANUFACTURING INC.
19493 DACHSUND AVE.
APPLE VALLEY, CA 92307-9302

**COURT MAILING LIST**
LOS ANGELES COUNTY FIRE
DEPT.
P.O. BOX 513148
LOS ANGELES, CA 90051-1148

**CLAIM FILED**
LOS ANGELES COUNTY FIRE
DEPARTMENT
PO BOX 910901
COMMERCE, CA 90091

**COURT MAILING LIST**
LUIS A. VAQUERANO
1350 W. 65TH ST.
LOS ANGELES, CA 90044-2618

**COURT MAILING LIST**
LUIS FARIAS
2146 FITZGERALD AVE.
COMMERCE, CA 90040-3910

**COURT MAILING LIST**
MANDATAIRES JUDICIAIRES
ASSOCIES
102 RUE DU FAUBOURG
SAINT DENIS
PARIS, 75479
FRANCE

**COURT MAILING LIST**
MARIA CARMEN SILVA
2819 ORCHARD PL., APT. A
SOUTH GATE, CA 90280-2786

**COURT MAILING LIST**
MARIA L. ORTEGA
5969 LUDELL ST.
BELL GARDENS, CA 90201-4052

**COURT MAILING LIST**
MARIO CLAROS
9856 ROBINIA ST.
FONTANA, CA 92335-7209

**COURT MAILING LIST**
MARIO MURILLO
10360 SAN ANTONIO AVE.
SOUTH GATE, CA 90280-6516

**COURT MAILING LIST**
MARVIN GOROSPE
861 N. FIFTH AVE.
COVINA, CA 91723-1009

**COURT MAILING LIST**
MARY LOU PE A
537 N. MILTON DR.
SAN GABRIEL, CA 91775-2203

**CLAIM FILED**
MCMASTER CARR SUPPLY CO
P.O. BOX 7690
CHICAGO, IL 60680-7690

**COURT MAILING LIST**
MERCHANT FINANCIAL
CORPORATION
1441 BROADWAY, 22ND FL.
NEW YORK, NY 10018-1905

**COURT MAILING LIST**
NEW YORK DEPT OF TAXATION &
FINANCE
BANKRUPTCY SECTION
P.O. BOX 5300
ALBANY, NY 12205-0300

**COURT MAILING LIST**
NEW YORK STATE WORKERS'
COMP. BOARD
328 STATE ST.
SCHENECTADY, NY 12305-3201

**COURT MAILING LIST**
NICOLAS VELEZ RUIZ
2819 ORCHARD PL., APT. A
SOUTH GATE, CA 90280-2786

**COURT MAILING LIST**
O.E.I. INTERNATIONAL, INC.
425 S. PINE ST.
SAN GABRIEL, CA 91776-2539

**COURT MAILING LIST**
OA TECHNOLOGY INC.
17128 COLIMA RD., #568
HACIENDA HEIGHTS, CA 91745-6769

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**COURT MAILING LIST**
OLD DOMINION FREIGHT LINE,
INC,
P.O. BOX 742296
LOS ANGELES, CA 90074-2296

**CLAIM FILED**
OLD DOMINION FREIGHT LINE,
INC.
ATTN CYRUS FRAZIER,
LITIGATION COORDINATOR
500 OLD DOMINION WAY
THOMASVILLE, NC 27360-8923

**COURT MAILING LIST**
OSCAR JIMENEZ
3433 WHISTLER AVE. #13
EL MONTE, CA 91732-2648

**COURT MAILING LIST**
OTSUMA PARTNERS, INC.
753 HURLBUT AVE.
SEBASTOPOL, CA 95472-2825

**COURT MAILING LIST**
PACKAGING PLUS
501 N. SMITH AVE., SUITE 102
CORONA, CA 92880-6967

**COURT MAILING LIST**
PEERLESS MATERIALS COMPANY
P.O. BOX 33228
LOS ANGELES, CA 90033-0228

**COURT MAILING LIST**
PIONEER CREDIT RECOVERY,
INC.
P.O. BOX 308
PERRY, NY 14530-0308

**CLAIM FILED**
R & G WELDING MFG., INC.
RODOLFO GUZMAN
9375 ARCHIBALD AVE., SUITE 503
RANCHO CUCAMONGA, CA 91730-
5704

**COURT MAILING LIST**
RAFAEL JIMENEZ
12227 FERRIS RD., APT. B
EL MONTE, CA 91732-2816

**CLAIM FILED**
REVCHEM COMPOSITES, INC.
PO BOX 333
BLOOMINGTON, CA 92316

**COURT MAILING LIST**
RICARDO RODRIGUEZ
12120 NORINO DR.
WHITTIER, CA 90601-2302

**COURT MAILING LIST**
RICARDO RUIZ LUA
678 W. 28TH ST.
SAN BERNARDINO, CA 92405-3328

**COURT MAILING LIST**
ROTARY COMPRESSOR CO.,
INC.
13419 VALLEY BLVD.
CITY OF INDUSTRY, CA 91746-
2418

**COURT MAILING LIST**
ST MEDIA GROUP
11262 CORNELL PARK DR.
CINCINNATI, OH 45242-1828

**COURT MAILING LIST**
SERVATIUS, O'BRIEN & FONG, LLP
2377 CRENSHAW BLVD., SUITE 320
TORRANCE, CA 90501-3346

**COURT MAILING LIST**
SHERWIN WILLIAMS CO.
13620 ROSECRANS AVE.
SANTA FE SPRINGS, CA 90670-
5025

**CLAIM FILED**
THE SHERWIN-WILLIAMS
COMPANY
MICHAEL B. BACH, AUTHORIZED
AGENT
25 WHITNEY DRIVE SUITE 106
MILFORD, OH 45150

**COURT MAILING LIST**
SMARK COMPANY
8636 OTIS ST.
SOUTH GATE, CA 90280-3220

**COURT MAILING LIST**
SOUTHLAND FIRE PROTECTION
CO.
1152 VIA VERDE
SAN DIMAS, CA 91773-4401

**CLAIM FILED**
STANLEY PEST CONTROL
2555 LOMA AVE.
SOUTH EL MONTE, CA 91733-1417

**COURT MAILING LIST**
SUSAN KINNEY LTD.
3023 N. CLARK ST., #210
CHICAGO, IL 60657-5200

**COURT MAILING LIST**
SUSAN KINNEY LTD.
4747 VIA CARMEN
NAPLES, FL 34105-5614

**CLAIM FILED**
SOUTHERN CALIFORNIA GAS
COMPANY
PO BOX 30337
LOS ANGELES, CA 90030

**CLAIM FILED**
TRIETSCH PROPERTY
ENTERPRISES LP
13951 MONTE VISTA AVE.
CHINO, CA 91710-5536

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

**COURT MAILING LIST**
UNISAN PRODUCTS
P.O. BOX 91257
LOS ANGELES, CA 90009-1257

**COURT MAILING LIST**
VERITAS
P.O. BOX 620
WALNUT, CA 91788-0620

**COURT MAILING LIST**
WEST WHITTIER PAINT
11408 E. WHITTIER BLVD.
WHITTIER, CA 90601-3199

**NOTICE PURPOSES**
DISNEY STORES USA, LLC
ATTN MANAGER OR
AUTHORIZED AGENT
443 SOUTH RAYMOND AVENUE
PASADENA, CA 91105

**DUPLICATE**
**COURT MAILING LIST**
EMPLOYMENT DEVELOPMENT
DEPT.
BANKRUPTCY GROUP MIC 92E
P.O. BOX 826880
SACRAMENTO, CA 94280-0001

**NOT APPLICABLE**
**COURT MAILING LIST**
LOS ANGELES DIVISION
255 EAST TEMPLE STREET,
LOS ANGELES, CA 90012-3332

**SEE PROOF OF CLAIM**
**ADDRESS**
**COURT MAILING LIST**
REVCHEM COMPOSITES, INC.
2720-B S. WILLOW AVE.
BLOOMINGTON, CA 92316

**REFUSED/CLOSED B29**
**UNABLE TO FWD**
**COURT MAILING LIST**
STAPLES ADVANTAGE
DEPT LA
P.O. BOX 83689
CHICAGO, IL 60696-0001

**RETURNED 7/20/18;**
**INSUFFICIENT ADDRESS;**
**UNABLE TO FORWARD**
**COURT MAILING LIST**
ROSS S. TCHALAKOV
1135 ALLEN AVE.
GLENDALE, CA 91201-3313

**COURT MAILING LIST**
UNITED PARCEL SERVICE
P.O. BOX 894820
LOS ANGELES, CA 90189-4820

**COURT MAILING LIST**
VERIZON WIRELESS
P.O. BOX 660108
DALLAS, TX 75266-0108

**CLAIM FILED**
ZAL INDUSTRIAL
4905 TELEGRAPH RD.
LOS ANGELES, CA 90022-3835

**RETURNED MAIL**

**DUPLICATE**
**COURT MAILING LIST**
FRANCHISE TAX BOARD
BANKRUPTCY SECTION MS A-340
P.O. BOX 2952
SACRAMENTO, CA 95812-2952

**SEE PROOF OF CLAIM ADDRESS**
**COURT MAILING LIST**
THE GAS COMPANY
P.O BOX C
MONTEREY PARK, CA 91756-0001

**SEE PROOF OF CLAIM ADDRESS**
**COURT MAILING LIST**
ANNEX AUTOMOTIVE COLORS
17999 VALLEY BLVD.
CITY OF INDUSTRY, CA 91744-5864

**RTS IN CHINESE 5-4-18**
**COURT MAILING LIST**
XIAMEN EURASIA ARTS CO. LTD.
32, NO. 2, ROAD
XINGLIN NORTH JIMEI ZONE
XIAMEN, 361022
CHINA

**COURT MAILING LIST**
UNIVERSAL METAL PRODUCTS
10050 VIA DE LA AMISTAD, STE 2482
SAN DIEGO, CA 92154-7248

**COURT MAILING LIST**
W. W. GRAINGER, INC.
100 GRAINGER PKWY.
LAKE FOREST, IL 60045-5202

**NOTICE PURPOSES**
DESTINATION MATERNITY, INC.
ATTN PRESIDENT
232 STRAWBRIDGE DRIVE
MOORETOWN, NJ 08057

**DUPLICATE**
**COURT MAILING LIST**
COFRAD, SA
12 RUE VAUVILLIERS
PARIS, 75001
FRANCE

**RETURNED 1/25/2018,**
**UNDELIVERABLE**
**COURT MAILING LIST**
AAP WINDDOWN, LLC
747 WAREHOUSE ST.
LOS ANGELES, CA 90021-1106

**RETURNED 2/22/2018,**
**UNDELIVERABLE**
**COURT MAILING LIST**
MIGUEL PANTOJA MENDOZA
15420 GALE AVE.
HACIENDA HEIGHTS, CA 91745-1509

**RETURNED 4/13/18 - VACANT/**
**UNABLE TO FWD**
**DEBTOR**
NORLAINE, INC,
1449 W. INDUSTRIAL PARK ST.
CONVINA, CA 91722-3414

**RETURNED 5.17.2018, 5.21.2018,**
**UNCLAIMED**
**COURT MAILING LIST**
NINGBO MAGNETICS FACTORY LTD.
G1 XIAOGANG DEVELOPMENT
ZONE
MAIL BOX 700
XIAOGANG, NINGBO
CHINA

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**